STATE OF CONNECTICUT *v.* BERNARD AVCOLLIE

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued February 8—decision released July 24, 1979

*Francis M. McDonald, Jr.,* state's attorney, with whom were *Bradford J. Ward* and *Walter H. Scanlon,* assistant state's attorneys, and, on the brief, *Joseph A. Hill,* assistant state's attorney, for the appellant (state).

*Theodore I. Koskoff* and *John D. Jessup,* for the appellee (defendant).

LOISELLE, J.   At approximately 2 a.m. on the morning of October 30, 1975, the defendant, Bernard Avcollie, and his neighbor, Carmine DiMaria, found the body of Avcollie's wife, Wanda, floating in the family swimming pool.   The two men pulled her from the pool.   An unsuccessful attempt at mouth-to-mouth resuscitation was made.   Mrs. Avcollie was pronounced dead by Dr. Joseph Vincitorio, the medical examiner of Waterbury, at about 2:47 a.m. He referred the matter for an autopsy.   On November 21, 1975, a grand jury returned a true bill accus-

ing Bernard Avcollie of intentionally murdering Wanda Avcollie in violation of § 53a–54a of the General Statutes.

The defendant elected a trial by jury. The jury returned a verdict of guilty, which was immediately set aside by the trial court, which stated that the defendant was acquitted. The state requested permission to appeal, which the trial court initially denied. On its own motion, the trial court reconsidered its decision and granted the state permission to appeal pursuant to General Statutes § 54-96. On appeal, the state raises three issues: (1) whether the trial court had the power to set aside the guilty verdict when the defendant had not made a motion for a directed verdict at the close of all the evidence; (2) whether the trial court properly set aside the verdict of guilty in the light of the evidence presented to the jury; and (3) whether the trial court properly excluded certain evidence. The defendant in his brief raises a fourth claim: whether this appeal violates his constitutional guarantee against double jeopardy.

## I

Because of its significance, we will address the defendant's double jeopardy claim first. This court previously determined that there was no double jeopardy bar to the state's appeal in this case. *State* v. *Avcollie,* 174 Conn. 100, 384 A.2d 315 (1977). The defendant, however, strenuously urges that we review our ruling on double jeopardy in that case in light of the five cases on the subject which were subsequently decided by the Supreme Court of the United States on June 14, 1978, and the overruling of a case claimed to have been relied upon as its authority by this court.

An examination of *Burks* v. *United States,* 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *Greene* v. *Massey,* 437 U.S. 19, 98 S. Ct. 2151, 57 L. Ed. 2d 15 (1978); *Crist* v. *Bretz,* 437 U.S. 28, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978); *Sanabria* v. *United States,* 437 U.S. 54, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978); and *United States* v. *Scott,* 437 U.S. 82, 98 S. Ct. 2187, 57 L. Ed. 2d 65 (1978); reaffirms our determination of the issue of double jeopardy which was reached previously in *State* v. *Avcollie,* supra. In that case, this court cited *United States* v. *Jenkins,* 420 U.S. 358, 95 S. Ct. 1006, 43 L. Ed. 2d 250 (1975), as authority for its ruling. In *United States* v. *Scott,* supra, the principal holding in *United States* v. *Jenkins,* supra, was overruled. That holding, however, was not the one relied upon by this court. Actually, the quotation from *United States* v. *Jenkins,* supra, cited in *State* v. *Avcollie,* supra, was a reiteration of the rule enunciated in *United States* v. *Wilson,* 420 U.S. 332, 95 S. Ct. 1013, 43 L. Ed. 2d 232 (1975), which was decided the same day as *Jenkins.* In *Sanabria* v. *United States,* supra, the principle stated in *United States* v. *Wilson* and *United States* v. *Jenkins* cited by this court as authority for its holding was reaffirmed. It was held in *United States* v. *Wilson,* supra, that when a case has been tried to a jury, the principle of double jeopardy does not prohibit an appeal by the prosecution providing that a retrial is not required in the event the prosecution is successful in its appeal. Thus, where a jury returns a verdict of guilty but the trial court thereafter renders a judgment of acquittal, an appeal is permitted and double jeopardy does not attach. None of the cases of the Supreme Court which were handed down since the ruling of this court is inconsistent with *State* v. *Avcollie,* supra.

## II

The state's first contention is that the trial court was without power to set aside the verdict because the defendant did not make a motion for a directed verdict at the close of all the evidence as was required by Practice Book, 1963, § 255 (now Practice Book, 1978, § 321).[1] We disagree. The procedural setting was as follows: The defendant made a motion at the close of the state's case for a dismissal, a directed verdict and judgment of acquittal upon which the court reserved decision. After this, both sides offered more evidence. The defendant did not renew his motion for a directed verdict at the close of all the evidence. The case was submitted to the jury on the charge of murder. After deliberating for some time, the jurors sent a note to the trial judge indicating they stood eleven to one for conviction. The court then gave the "Chip Smith" charge to the jury as to their duty to respect the views of each other. At this time, over an objection by the state, the defendant made a motion for a directed verdict. The court again reserved decision on the motion. Shortly thereafter the jury returned a guilty verdict. After the foreman announced the verdict in open court, the defense counsel asked that the jury be excused, prior to the acceptance of the verdict. In the absence of the jury, the defendant renewed his previously made motions and moved under Prac-

---

[1] Practice Book, 1963, § 2310 (now Practice Book, 1978, § 899), providing for a motion for acquittal upon a verdict of guilty, did not govern this situation because it did not apply under Practice Book, 1963, § 2433, as amended (now Practice Book, 1978, § 1022), which provided that "[t]hese rules shall take effect on October 1, 1976, and shall govern all criminal proceedings in which an arrest is made or a summons issued on or after said date." See *State* v. *Avcollie*, 174 Conn. 100, 108 n.4, 384 A.2d 315 (1977).

tice Book, 1963, § 255 to set aside the verdict. The court ordered the verdict set aside and directed an acquittal.

On appeal the state asserts that the trial court had no authority or jurisdiction to hear and grant such a motion because Practice Book, 1963, § 255 which controlled at the time, required a motion for a directed verdict at the close of all the evidence. *Goldberger* v. *David Roberts Corporation,* 139 Conn. 629, 633–34, 96 A.2d 309 (1953). In *Belchak* v. *New York, N.H. & H. R. Co.,* 119 Conn. 630, 637, 179 A. 95 (1935), it was held that "[t]he trial court has inherent power to set aside the verdict, even though no motion has been made." See also *Munson* v. *Atwood,* 108 Conn. 285, 288, 142 A. 737 (1928); *Brown* v. *New Haven Taxi Cab Co.,* 92 Conn. 252, 255–56, 102 A. 573 (1917). Furthermore, it was held in *Casey* v. *McFarlane Bros. Co.,* 83 Conn. 442, 76 A. 515 (1910), that the trial court need not have a motion before it as a prerequisite to setting a verdict aside if one is eventually made. See also Maltbie, Conn. App. Proc. § 181.

The policy behind the requirement of § 255 was the giving of notice to the trial court. The defendant fulfilled this requirement by twice making a motion for a directed verdict. While we acknowledge that following established procedures is a necessary prerequisite for a just and fair trial, we do not believe that strict adherence to form has talismanic significance. The trial court's power to set aside a verdict is inherent; the Practice Book merely lays out an advisable manner of exercising it. The defendant, moreover, did make the requisite motion, although not in the correct sequence. Therefore, the trial court did have the power to grant it.

## III

The central issue raised by the state is whether the trial court erred in setting aside the jury's verdict in light of the evidence adduced at trial. It is the function of the jury to consider evidence, draw logical deductions and make reasonable inferences from facts proven, that is, to decide guilt or innocence. *State* v. *Hicks,* 169 Conn. 581, 585, 363 A.2d 1081 (1975); *State* v. *Williams,* 169 Conn. 322, 336, 363 A.2d 72 (1975); *State* v. *Benton,* 161 Conn. 404, 410, 288 A.2d 411 (1971). This power, however, is not absolute. As noted above, the court has an inherent power to set verdicts aside. Maltbie, Conn. App. Proc. § 181.

The court serves a supervisory function vis-a-vis the jury in this situation: "In passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. The juror must use all his experience, his knowledge of human nature, his knowledge of human events, past and present, his knowledge of the motives which influence and control human action, and test the evidence in the case according to such knowledge and render his verdict accordingly. A juror who did not do this would be remiss in his duty. The trial judge in considering the verdict must do the same, or fail in the discharge of that function which the law has laid upon him; and if, in the exercise of all his knowledge from this source, he finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case, or were governed by ignorance, prejudice, corruption or partiality, then it is his duty to set aside the verdict." *Howe* v. *Ray-*

*mond,* 74 Conn. 68, 72, 49 A. 854 (1901). In *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 19–20, 96 A. 169 (1915), this court enumerated several of the reasons for setting aside a verdict: "It was the court's duty to set aside the verdict if its manifest injustice was so plain and palpable as to justify the suspicion that the jury or some of its members were influenced by prejudice, corruption or partiality. *Fell* v. *Hancock Mutual Life Ins. Co.,* 76 Conn. 494, 496, 57 Atl. 175; *Burr* v. *Harty,* 75 Conn. 127, 129, 52 Atl. 724. And this is true even if the evidence was conflicting, and there was direct evidence in favor of the . . . [party], who prevailed with the jury. *Bradbury* v. *South Norwalk,* 80 Conn. 298, 300, 68 Atl. 321; *Cook* v. *Morris,* 66 Conn. 196, 211, 33 Atl. 994; *Kinne* v. *Kinne,* 9 Conn. 102, 106. Clearly the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses and in the weighing of conflicting testimony, as in any other respect. It is one of the duties of a judge, in the due performance of his part in jury trials, to see to it that such influences, apparently operating upon the jury, do not prevail, and manifest injustice thereby be done."

It has also been held that the trial court is obligated to overturn the jury's verdict when it is based on physically impossible conclusions: a verdict should be set aside "[w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." *Budaj* v. *Connecticut Co.,* 108 Conn. 474, 476, 143 A. 527 (1928). The final test is "whether

the jury could reasonably have concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977).

The trial court in overturning the jury's verdict in the present case did not file a memorandum of decision as required by Practice Book, 1963, § 256 (now Practice Book, 1978, § 322). It, however, did explain orally to the jury that it granted the motion because it felt that the state did not carry its burden of proof.[2] In the memorandum of decision in which

---

[2] The court explained its action to the jury as follows:

"It is fundamental that the trier may not reach a conclusion of guilty where the facts established by the evidence, including those reasonably and logically inferred from other proven facts, are rationally consistent with the innocence of the accused.

A conclusion of guilty requires proof beyond a reasonable doubt. And proof to that extent is proof which precludes every reasonable hypothesis, except that which it tends to support, and it is consistent with the defendant's guilt and inconsistent with any other rational conclusion.

In criminal jury trials, the State has the burden of producing evidence from which the jury may rationally conclude that the defendant has been proven guilty of the essential elements of the crime beyond a reasonable doubt.

The Court does not feel that the burden was borne here by the State. . . . The Court would feel that a manifest injustice would take place when this verdict is so plain as to justify relief from the Court.

I don't know what has influenced the jury but evidently it has been a failure to understand the charge in this case and whatever extraneous matters may have interfered with a fair trial as a result of outside influences.

The Court feels under those circumstances that the verdict should be set aside and the judgment of acquittal entered.

I realize that this is a case of circumstantial evidence but even cases of circumstantial evidence must be proven beyond a reasonable doubt.

As I have said before, and I have said it before in my charge on several occasions, and I repeat it. The law never permits inferences

it granted permission to the state to appeal, it stated that the verdict was set aside because "the evidence, under the law, [was] not sufficient to justify a finding of guilty beyond a reasonable doubt."[3] Nothing in either the transcript of its remarks or memorandum of decision indicates that the court's action was based on a belief that the jury had been influenced by prejudice, corruption or partiality. See *Howe* v. *Raymond,* supra, 72.

to be drawn or assumptions depending upon other inferences or assumptions. [See the discussion on the permissibility of inferences on page 8 (infra).]

It is the Court's feeling that this case does not warrant conviction under the proof as brought by the State. . . . The Supreme Court has spoken many times, many times in the past, about the judge's responsibility in the trial of a criminal case. And on many, many occasions, probably long before even you or I were born, the Supreme Court has entered a mandate that said that the trial court has a responsibility when a motion for a judgment of acquittal is entered, either before or after a jury verdict and that the Court's responsibility, if the evidence is not sufficient to support a verdict, that it should be set aside. And I so do it here.

. . . Ladies and gentlemen of the jury, your verdict has been noted by the Court. In accordance with the Court's responsibility assumed by me, it is the Court's feeling that either you did not understand the charge or that you did not weigh all of the evidence properly, and that the verdict should be set aside. And I am so doing it at this time."

[3] The trial court's memorandum read as follows:

"The basis for entering a judgment of acquittal is where the state's relevant and reliable evidence is insufficient or insubstantial to warrant a conviction by the jury. Such was the case here. The crime of murder *as alleged in the indictment* was not, in my opinion, proved beyond a reasonable doubt. Rather, the state's evidence of guilt, taken as a whole, was so weak that, upon my best consideration and judgment, I was of the clear view that 'the reasoning mind could not reasonably reach a conclusion other than that the evidence, under the law, [was] not sufficient to justify a finding of guilty beyond a reasonable doubt.' *State* v. *Torello,* 100 Conn. 637, 643, 124 A. 375, 377 (1924). Under these circumstances — the government having failed to meet its constitutional burden — it was my duty to order the entry of a verdict of acquittal; and not to have done so would have resulted in a serious miscarriage of justice."

In *Burr* v. *Harty,* 75 Conn. 127, 129–30 (1902), we distinguished between the inquiry made by the trial court in ascertaining whether the jury's verdict should be set aside and our review of the trial court's action: "[w]hen this matter comes before us upon proceedings in error, the question is substantially that presented to the trial court, but with this limitation: the trial court has seen and heard the witnesses and all the transactions of the trial that may properly influence the triers in reaching their conclusions from the evidence, and is bound to consider this judicial knowledge in drawing its inference that the verdict is or is not manifestly against evidence. We can consider only the printed testimony, and in considering that must make allowance for the absence of those facts which were before the trial court." In this appeal, neither the record nor either brief refers to any considerations on which the court based its decision to overturn the verdict other than the insufficiency of the evidence.

The elements of intentional murder with which the defendant was charged under General Statutes § 53a–54a are: (1) intent, (2) causation, and (3) death by killing as opposed to death by accident or suicide. The state has the burden of proving every element of the crime beyond a reasonable doubt. *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); and *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

The central factual issue in the present case was whether Wanda Avcollie was strangled to death. The state contended that she was; the defendant put on evidence to indicate that she drowned, either by accident or as the result of a suicide attempt.

The state is obligated to prove that death was neither suicide nor the result of an accident. *State v. Hanna,* 150 Conn. 457, 461, 191 A.2d 124 (1963). When the cause of death is to be determined by medical testimony, it has to be established by that testimony beyond a reasonable doubt. *Commonwealth v. Radford,* 428 Pa. 279, 236 A.2d 802 (1968). The state and the defense presented contradictory expert medical testimony on this issue. The state's witnesses said Mrs. Avcollie was strangled to death; the defendant's witnesses testified that she drowned. Opinion testimony of an expert is not binding on the trier. The jury was not bound by the opinion of any one of the expert witnesses and could reject in whole or in part his opinion regardless of whether they believe or disbelieve the subordinate facts on which the opinion was based. *Birgel v. Heintz,* 163 Conn. 23, 30, 301 A.2d 249 (1972); *Desmarais v. Pinto,* 147 Conn. 109, 111, 157 A.2d 596 (1960).

The issue, therefore, resolved itself into one of credibility to be determined by the jury as trier of fact. *State v. Panella,* 168 Conn. 532, 534, 362 A.2d 953 (1975); *State v. Malley,* 167 Conn. 379, 381, 355 A.2d 292 (1974); *State v. Bradley,* 134 Conn. 102, 105, 55 A.2d 114 (1947). The jury were confronted with conflicting evidence on nearly every point. The choice of the more credible evidence was for them to make. *Novella v. Hartford Accident & Indemnity Co.,* 163 Conn. 552, 316 A.2d 394 (1972); *Petrizzo v. Commercial Contractors Corporation,* 152 Conn. 491, 499, 208 A.2d 748 (1965); *Desmarais v. Pinto,* supra, 110. The evidence must be given a construction which is most favorable to the sustaining of the jury's verdict. *State v. Panella,* supra, 534; *State v. Benton,* 161 Conn. 404, 409, 288 A.2d 411 (1971).

In support of its contention that Wanda Avcollie was strangled, the state called two medical experts to testify: Dr. Elliot Gross, chief medical examiner of Connecticut, and Dr. Leslie Lukash, chief medical examiner of Nassau County, New York. Dr. Gross performed the autopsy on Mrs. Avcollie some twelve hours after her body was found. Dr. Gross testified in part as follows: He observed petechial hemorrhages in the conjunctiva and on the inner surface of the eyelids, some slight froth in the nostrils, and hemorrhages along the reflected scalp. Upon removing Mrs. Avcollie's clothing, he noted an unhooked gold circlet with a pendant around her neck. Under the pendant was a slight superficial laceration of the skin. There were other lacerations and contusions around the neck where the necklace had been. There were no broken bones of the cervical spine. There were hemorrhages on the sternothyroid muscle, on parts of the larynx and the thyroid cartilage. There were no fractures in the cartilages of the larynx or the thyroid bone. There was a fine froth in the trachea and the bronchi. There were recognizable food particles: meat fragments, string beans, fragments of lettuce and seeds of perhaps a cucumber in the stomach. No recognizable food was found in the duodenum. There were no recognizable tablets or medication in the stomach. He found hemorrhages in the deep muscles of the neck. He opined that the hemorrhages in the deep muscles, in the tips of the thyroid cartilage and on the left side of the neck were interrelated. Based on the interrelation of the injuries, Dr. Gross concluded that Wanda Avcollie died from asphyxia by strangulation. The lungs were dry. Dr. Gross opined that because of the lack of fluid in the lungs, Wanda Avcollie did not drown.

Dr. Lukash testified that it was his opinion that Wanda Avcollie died by strangulation. He was not present at the autopsy, but based his opinion on the records and photographs of the autopsy that revealed lacerations around the neck, deep hemorrhages around the cartilages of the voice box, the hemorrhages in the eyeballs, under the eyelid and around the scalp tissue, the area of contusion on the neck and lineal abrasions of the skin.

To rebut the state's witnesses' testimony that Wanda Avcollie died of strangulation, the defendant presented three expert medical witnesses: Dr. Michael Baden, at the time of trial deputy chief medical examiner for the city of New York, Dr. Cyril Wecht, former coroner of Allegheny County, Pennsylvania, and Dr. Werner Spitz, the chief medical examiner of Wayne County, Michigan.

Dr. Baden viewed all the tissues of Mrs. Avcollie which Dr. Gross had preserved and examined all autopsy findings, the toxicological reports, and all photographs of the body taken at the scene and at the University of Connecticut Health Center at Farmington as well as the photographic slides taken during the autopsy. Dr. Baden was asked for his opinion on the cause of death of Mrs. Avcollie, taking into consideration the following: There was a "thud" when the body was dropped faced down on the cement as it was being removed from the swimming pool; none of the people who viewed the body at poolside observed any foam discharging from the mouth, but one person noticed a discharge from her nostrils; Dr. John Elsner, the first physician to examine the body at 2:20 a.m., observed neither rigor mortis nor lividity; Dr. Vincitorio, who pronounced Mrs. Avcollie dead, observed the beginnings of rigor mortis; Mr. Avcollie grasped

his wife under the chin as he tried to get her out of the pool; one of the funeral directors saw a clear white discharge coming from Mrs. Avcollie's nose; the funeral director moved the body twice from stretcher to stretcher by lifting and pulling Mrs. Avcollie by the neck; according to Dr. Stolman, the state toxicologist, Mrs. Avcollie's stomach contained five ounces of food; her blood contained both alcohol and a small amount of pentobarbital; Mr. Avcollie testified that the family had meat and rice or cauliflower and a salad for supper, Lisa Avcollie testified they had meat, cauliflower and a salad; and there was a string bean in the stomach when the autopsy was performed. Based on his review of the above evidence and taking into consideration all of the above testimony, Dr. Baden's opinion was that Mrs. Avcollie was alive when she went into the pool and died as a result of drowning and that many of her injuries occurred post mortem as the result of handling or as a result of the protocol used by Dr. Gross in the autopsy. Dr. Baden, in explaining his opinion, testified that it was based on the fact that in a poolside photograph Mrs. Avcollie's complexion was pale which is consistent with drowning, explaining that in strangulation there would be a more bluish hue to the face; that there was an absence of any signs of struggle—Mrs. Avcollie's clothes and makeup were intact; that the hemorrhages in the whites of the eye are present in both strangulation and drowning; that the injuries around Mrs. Avcollie's neck could as well have been caused by post-mortem handling; that there was no trauma to the neck directly beneath these superficial contusions and where there was subsurface trauma, there was no injury to the skin directly above it; and that the small hemorrhages noted

after the scalp was reflected were caused by the autopsy itself. Dr. Baden further noted that neither the hyoid bone, the thyroid cartilage nor the cricoid cartilage was fractured as one would expect in the manual strangulation of an adult and that the thyroid cartilage, the hyoid bone or the cricoid cartilage would be fractured in 90 to 95 percent of the cases of adults with ossification of these organs who were manually strangled. Dr. Gross observed that there was ossification with Mrs. Avcollie. Dr. Baden further testified that the hemorrhages to the superior tips of the thyroid cartilage and the left sternothyroid muscle could have been caused by post-mortem handling, by being laid face down after death in a fetal position, as had been done, or by a blow, as well as by strangulation.

Dr. Cyril Wecht testified for the defense after reviewing Dr. Gross' tissue slides, photographs and Kodachrome slides. Dr. Wecht's opinion was that Mrs. Avcollie died as a result of drowning. As a result of his review, Dr. Wecht found that the condition of Wanda Avcollie's clothes, her complexion, the presence of foam and froth in the mouth, nostrils, bronchi, trachea and larynx, the lack of petechrae in pleural, epicardial and pericardial surfaces, the fact that the cartilages of the neck were intact and that the hyoid bone was not fractured were all consistent with drowning.

Dr. Wecht detailed three types of strangulation: ligature, mugging-type and manual. According to his evaluation, Mrs. Avcollie's injuries were not consistent with any one of them.

Dr. Werner Spitz also testified for the defense, relying upon the facts that Mrs. Avcollie was dropped when she was taken from the pool; that

prior to her death she had been hauled out of the car by her shoulders and wrists; that the first doctor on the scene noticed no rigor mortis or lividity; that Dr. Vincitorio who arrived later noticed no lividity but observed the beginnings of rigor mortis; that the defendant grabbed Mrs. Avcollie by the chin in dragging her from the pool; that the funeral director noticed she was purging from the nose; that at the scene her blouse was buttoned to the top; and that she was grasped by the neck several times when moved from stretcher to stretcher. On the basis of the above facts and the pictures, slides and histological slides in evidence, Dr. Spitz came to the conclusion that on the basis of a "reasonable medical probability," Mrs. Avcollie died of drowning and that the hemorrhages and other injuries that could have been produced by strangulation were all consistent with death by drowning. Dr. Spitz would not have listed this case as a homicide.

It was incumbent upon the state to prove, beyond a reasonable doubt, that the defendant was the one who committed the murder; *State* v. *Tillman,* 152 Conn. 15, 202 A.2d 494 (1964); and that he possessed the specific intent to cause the death of Wanda Avcollie, the intent to achieve this result being an essential element of the crime charged. *State* v. *Holley,* 174 Conn. 22, 25-26, 381 A.2d 539 (1977); *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917 (1973); *State* v. *Bitting,* 162 Conn. 1, 5, 291 A.2d 240 (1971). The intent of the actor is a question for the trier of fact, and the conclusion of the trier in this regard should stand unless it is an unreasonable one. *State* v. *Holley,* supra, 26; *State* v. *Ruiz,* 171 Conn. 264, 271, 368 A.2d 222 (1976); *State* v. *Bzdyra,* supra.

To establish who committed the murder and the necessary intent, the state offered the following evidence: Mrs. Avcollie had made up her mind to confront the defendant that evening about his extramarital relationship and to tell him she wanted a divorce. The defendant and Mrs. Avcollie were alone together, drinking and talking the night Mrs. Avcollie was killed. Their discussion became quite heated. They moved outside to the pool area to avoid waking the children.

Mrs. Avcollie ate dinner between 6 and 6:30 p.m. When the autopsy was performed, recognizable food particles were found in the stomach. No recognizable food was found in the duodenum. Expert testimony established that the stomach empties following the ingestion of a meal within three to five hours. Mrs. Avcollie's stomach contents set the time of death at around 11:30 p.m.

Dr. Stolman examined specimens of her blood and body tissues and determined that at the time of death Mrs. Avcollie had a blood level alcohol of .02 percent, representing about one ounce of 86 proof whiskey which would have very little effect on the nervous system. He also found a blood level of .03 milligrams per hundred milliliters of pentobarbital, too small an amount to produce any observable effect on the nervous system.

The total pentobarbital found in Wanda Avcollie's body was less than one-half of a 100 milligram pill. The dosage of no more than one-half of a 100 milligram pill was taken less than five hours before death. The defendant testified that Wanda Avcollie took a pill at around 5:30 to 5:45 p.m. There was no valium in Wanda Avcollie's body when the autopsy was performed.

In his first statement to police, the defendant denied moving his car that night. A neighbor's child testified that sometime after midnight she saw the defendant's car turn in the driveway. After the defendant got out of the car, the witness saw a light go on which was not an interior car light and then she saw the defendant carrying a large object in both of his arms.

The defendant gave the following version of the events of the evening of Wanda Avcollie's death: After their children went to bed, Mr. Avcollie mixed a couple of "stiff" drinks for himself and his wife. They put on some records and began to talk. Mrs. Avcollie was depressed over her father's death. At 10:45 p.m. the defendant made two more stiff drinks for his wife and himself. While they were drinking their second drink, the defendant told Mrs. Avcollie that he no longer loved her and that he wanted to move out. The discussion was getting noisy, so they moved outside to the pool area. At this point the defendant made a third pair of drinks. Mrs. Avcollie was very upset and cried for about 45 minutes. Mrs. Avcollie suggested that they have another drink, but the defendant refused and insisted they go inside because Mrs. Avcollie was sobbing a great deal and slurring her words. At this point, Mrs. Avcollie announced that she was going for a ride. The defendant took the keys away from her because he felt she was drunk. She slapped the defendant and kicked him in the shins. He grabbed her wrists to stop her. She broke away and yelled that she was going across the street to the DiMarias' to sleep.

The defendant went inside, lay down on the couch and fell asleep. This was somewhere around midnight. He woke up around 1 a.m. and went upstairs where he found pills and empty pill bottles strewn

around everywhere. One was an empty bottle of valium. He became alarmed and started looking for his wife. According to the first statement he gave the police, the defendant said after looking outside he called the DiMarias and some other neighbors, the Browns, at 1:20 a.m. He checked the pool area twice. The third time, he found Wanda's body. The defendant told the police he did not go anywhere in his car that night.

"When the conclusion is one dependent upon how conflicting testimony shall be resolved, the trial court should ordinarily leave the case to the jury." *State* v. *Torello,* 100 Conn. 637, 647–48, 124 A. 375 (1924). The evidence on the cause of death was conflicting on nearly every point, but the defendant did not contend nor did he present any evidence that the state's theory was based on physically impossible facts and conclusions. It was the jury's prerogative to decide which version to accept as long as there was evidence to support it beyond a reasonable doubt. The court overturned the verdict on the ground that the evidence was insufficient. On appeal here, the issue is whether the jury could have reasonably come to the conclusion that Wanda Avcollie was strangled by the defendant.

The trial court did not find that the testimony of any of the state's expert witnesses was based on physically impossible conclusions or that the jury were prejudiced or influenced by extraneous influences. On the basis of the printed record,[4] which we are limited to on appeal, we find that the jury's conclusion that Wanda Avcollie was strangled was established beyond a reasonable doubt if the evidence of the state was believed and that of the defendant was rejected.

---

[4] The defendant has not claimed any illegal influence on the jury.

There was no direct evidence to link the defendant to the slaying nor to establish his intent. However, "[t]he law recognizes no distinction between circumstantial evidence and direct evidence so far as probative force is concerned." *State* v. *Smith,* 138 Conn. 196, 200, 82 A.2d 816 (1951). "It was within the province of the [trier] to draw reasonable and logical inferences from the facts proven. *State* v. *Pundy,* 147 Conn. 7, 12, 156 A.2d 193; *State* v. *Foord,* 142 Conn. 285, 294, 113 A.2d 591." *State* v. *Benton,* supra, 410. Also, the jury can draw an inference from the facts they found as the result of other inferences. *State* v. *Gonski,* 155 Conn. 463, 468, 232 A.2d 483 (1967); *State* v. *Hayes,* 127 Conn. 543, 18 A.2d 895 (1941); 1 Wigmore, Evidence (3d Ed.) § 41. The inquiry of this court is directed to whether, on the facts established and the inferences reasonably to be drawn therefrom, the verdict can be supported. *Jackson* v. *Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *Benton,* supra, 410.

The state established that the defendant had the opportunity to kill his wife. There was testimony that they were alone, involved in a violent argument, that he did not love her and that he wanted to leave her for another woman. It also established that Wanda Avcollie had not consumed enough drugs or alcohol to affect her judgment and physical reactions and that she died between 11:30 and 12 midnight, not at 2 a.m. as the defendant contended. Further, the state produced evidence showing some of the defendant's claims to be inconsistent with statements originally made to the police. The state also produced evidence in direct contradiction to the testimony given by the defendant, i.e., the state's witnesses testified that there was a very small

amount of alcohol in Mrs. Avcollie's body as opposed to the large quantity the defendant contended she drank; the neighbor's child stated that the defendant drove down the street and into the driveway around midnight, while the defendant contended it was much later; and the state's experts testified there were no traces of valium in Mrs. Avcollie's body post mortem, while the defendant's testimony as to the finding of the pills was no doubt to imply that Mrs. Avcollie had taken them. Once the fact of a murder had been established, the jury could reasonably infer from the evidence outlined above that the defendant was the perpetrator and that he intended to do what he did.

There is error,[5] the judgment of the trial court is set aside, the jury verdict is reinstated, and the case is remanded with direction to render judgment that the defendant is guilty and that sentence be imposed.

In this opinion the other judges concurred.

---

[5] The state's final claim, which is totally irrelevant to the main issue raised in this appeal, is that the trial court improperly excluded evidence found in the defendant's automobile. We will not consider this issue because it is not properly before us. The trial court granted the state permission to appeal its setting aside of the jury's verdict. The question presented to this court was whether the jury had sufficient evidence before it from which it could have concluded that the defendant was guilty beyond a reasonable doubt. The evidence the state is claiming was improperly excluded was obviously not considered by the jury in reaching its verdict. Therefore, it cannot be considered by this court on appeal. In addition, the pressing of this claim on appeal is unnecessary overreaching on the part of the state. Whether it could be considered even under other reasons of appeal is problematical in view of the double jeopardy issue, but, at any rate, the sole issue in this appeal was whether the evidence before the jury was sufficient to support their verdict. It was improper to raise this claim in this appeal.