# STATE OF CONNECTICUT *v.* ANTONIO G. BARNES
## (AC 26309)

Schaller, Rogers and Lavine, Js.

Argued October 20, 2006—officially released January 16, 2007

*Arthur L. Ledford,* special public defender, for the appellant (defendant).

*Karen A. Roberg,* certified legal intern, with whom were *Susann E. Gill,* senior assistant state's attorney, and, on the brief, *Patricia M. Froehlich,* state's attorney, and *Matthew A. Crockett,* deputy assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, J. The defendant, Antonio G. Barnes, appeals from the judgment of conviction, rendered after a jury trial, of assault in the third degree in violation of General Statutes § 53a-61 (a) (1), burglary in the third degree in violation of General Statutes § 53a-103, breach of the peace in the second degree in violation of 53a-181 (a) (2), attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), reckless endangerment in the first degree

in violation of General Statutes § 53a-63, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) and criminal violation of a protective order in violation of General Statutes § 53a-223.[1] On appeal, the defendant claims that the evidence was insufficient to convict him of attempt to commit assault in the first degree, in that the state failed to prove beyond a reasonable doubt that he was at the crime scene and discharged a firearm, and burglary in the third degree, in that the state failed to prove beyond a reasonable doubt that he intended to commit a crime within the subject dwelling. The defendant also claims that his sixth amendment rights were violated when the trial court failed to investigate adequately a potential conflict that he did not waive. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, are relevant to our resolution of the defendant's appeal. In August, 2003, Tammy Barnes, the defendant's wife, was living with her cousins, Patricia Mudge and George Mudge, at the Mudges' apartment in Danielson. At that time, Tammy Barnes was not living

---

[1] The defendant was charged under two separate informations. One bore docket number CR-03-120021 and charged the defendant with the following three counts relating to events that occurred on or about August 2, 2003: assault in the third degree in violation of General Statutes § 53a-61 (a) (1), burglary in the third degree in violation of General Statutes § 53a-103 and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (2). The other bore docket number CR-03-120445 and charged the defendant with the following four counts relating to events that occurred on or about September 4, 2003: attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), reckless endangerment in the first degree in violation of General Statutes § 53a-63, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) and criminal violation of a protective order in violation of General Statutes § 53a-223. The state filed a motion for joinder on July 6, 2006 to try docket number CR-03-120445 and four other files together. On September 1, 2004, an agreement was reached to try docket numbers CR-03-120021 and CR-03-120445 together. The defendant was found guilty on all charges on October 6, 2004.

with the defendant, and he was not welcome in the Mudges' apartment. On August 2, 2003, Tammy Barnes was in the living room watching television, and Patricia Mudge was working on her computer in the kitchen, which was adjacent to the living room. Patricia Mudge heard a knock on the door but did not receive a response when she asked if anyone was there. The screen door to the apartment was closed but unlocked, and the other door was open. Tammy Barnes noticed her cellular telephone displaying the defendant's number and ringing on the floor next to the television, but before she could get to it, the defendant stepped in front of her and grabbed the cellular telephone. She had not known that the defendant was in the apartment until he stepped in front of her.

As Tammy Barnes tried to reach for her cellular telephone, the defendant punched her on the back of her head with his fist, causing her to fall to the floor. Patricia Mudge came into the living room after she heard Tammy Barnes shout that the defendant was in the apartment. Patricia Mudge entered the living room and saw the defendant move toward Tammy Barnes and grab her arms so she could not move. Tammy Barnes told Patricia Mudge to telephone the police. The defendant responded that he would be able to hit Tammy Barnes before the police could arrive. Patricia Mudge told the defendant to leave. He did so, but Tammy Barnes followed him because the defendant had the cellular telephone. There were two carloads of men outside the Mudges' apartment. The defendant tried to push Tammy Barnes into one of the cars and told his friend inside to open the car door, but the friend refused to do so. While outside, the defendant also broke her cellular telephone after it rang. When Tammy Barnes told someone to telephone the police, the defendant left. Subsequent to that incident, Tammy Barnes obtained a

protective order prohibiting the defendant from coming near her.[2]

On September 3, 2003, the defendant borrowed a gray Toyota Camry from his girlfriend, Melissa Cahoon, and left at 7:30 p.m. from her house in Hope Valley, Rhode Island, which is approximately one hour by car from Danielson. At approximately 9 p.m., the defendant telephoned George Mudge. According to George Mudge, the defendant was very irate and screaming that he wanted to know the whereabouts of Tammy Barnes. George Mudge informed the defendant that Tammy Barnes was not at his residence, despite the fact that she was. The defendant telephoned George Mudge again and was again irate and looking for Tammy Barnes. During this telephone conversation, the defendant threatened Tammy Barnes, stating: "I'll split her wig. I'm crazy. I don't care about the police. They'll have to take me dead." The defendant telephoned George Mudge three or four more times that night, swearing and accusing Tammy Barnes of marital infidelity. At some point, George Mudge telephoned the defendant to tell him to stop calling.

In the early morning hours of September 4, 2003, at approximately 1 or 2 a.m., Timothy Marcotte, Tammy Barnes' brother, heard knocking on the first floor bedroom window of his home on 75 Prospect Street in Danielson. Marcotte opened the window shades and discovered the defendant outside his window wearing a New York Yankees jacket. Through the closed window, the defendant asked Marcotte if Tammy Barnes was inside. Tammy Barnes had lived at 75 Prospect Street with Marcotte for approximately two months in early 2003. When she lived at the residence, she stayed in a bedroom on the second floor and had stayed in

---

[2] The protective order later was modified to permit the defendant to be near Tammy Barnes when the two were receiving counseling.

that bedroom five or six times with the defendant. When Marcotte told the defendant that she was not there, a loud verbal disagreement ensued in which the defendant accused Marcotte of lying, claiming that he believed Tammy Barnes was upstairs in her bedroom. The defendant continued arguing with Marcotte until Marcotte told the defendant that he was coming outside. Marcotte began walking toward the kitchen and heard what sounded to him like rocks being thrown against his residence and a window breaking. Marcotte telephoned the police and went outside but did not see anyone. Thereafter, state police Trooper Eric Leroux arrived at Marcotte's residence in response to what Leroux testified was a telephone call from Marcotte reporting that gunshots had been fired near his residence. Leroux and Marcotte walked to the rear of the residence where the noises had been heard and discovered bullet holes in the side of the house, as well as a broken window. Leroux explained to Marcotte that it was not rocks but bullets that he had heard. Leroux and Marcotte also observed damage inside the house, specifically bullet holes in the upstairs bedroom where Tammy Barnes and the defendant previously had stayed as well as another in the kitchen. Marcotte testified that the bullet holes were not present the day before.

Dawn Sears, a neighbor of Marcotte's, residing at 83 Prospect Street, was awakened at 2 a.m. by loud male voices arguing on the right side of her residence. Sears next heard four or five gunshots approximately ten to fifteen seconds after she heard the argument. She looked outside her bedroom window and saw a man wearing baggy clothing running along Prospect Street away from the noises, toward Williams Street. Sears lost sight of the individual but heard a car door open and shut and a vehicle's engine start. Mark Tyler, another neighbor of Marcotte who lived at 102 Prospect Street located on the corner of Prospect Street and Williams

Street, also awoke at approximately 2 a.m. when he heard four or five gunshots. Tyler looked out a window and noticed an extra car parked on Prospect Street in front of his house, which he described as a light blue or gray Nissan Sentra or a small compact car of some type. Tyler then saw someone running along the street toward his house. He heard a car door open and saw something being tossed onto the passenger seat.

The defendant returned to Cahoon's house between 3:00 and 3:30 that morning and went to bed. Cahoon noticed that the defendant was wearing a New York Yankees jacket when he returned to her house. On September 4, 2003, the defendant was arrested by Rhode Island state police. Detective Terrence McFadden later investigated Marcotte's residence and found in the backyard seven spent shell casings, which were all fired from the same .45 caliber semiautomatic firearm.

After trial to the jury, the defendant was found guilty of assault in the third degree, burglary in the third degree, breach of the peace in the second degree, attempt to commit assault in the first degree, reckless endangerment in the first degree, criminal possession of a firearm and criminal violation of a protective order. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to convict him of attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1), and burglary in the third degree in violation of § 53a-103. We disagree.

We first set forth our standard of review. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency

of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical . . . to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

A

A conviction of attempt to commit assault in the first degree, in violation of §§ 53a-49 (a) (2)[3] and 53a-59 (a) (1),[4] requires proof of intentional conduct constituting a

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

substantial step toward intentionally causing the victim serious physical injury by means of a dangerous instrument. The defendant challenges the sufficiency of the evidence on the grounds that the state failed to prove beyond a reasonable doubt that he was at the crime scene and that he discharged a firearm at Marcotte's house.

The evidence, viewed in the light most favorable to sustaining the verdict, reveals facts from which the jury reasonably could have inferred that the defendant was at the crime scene and discharged a firearm at Marcotte's house. George Mudge testified that the defendant telephoned his house several times on the night in question looking for Tammy Barnes. According to George Mudge, the defendant was very irate and threatened to "split her wig." Later that night, Marcotte awoke at approximately 1 or 2 a.m. to find the defendant outside his bedroom window looking for Tammy Barnes. An altercation ensued in which the defendant claimed that, contrary to Marcotte's assertions, Tammy Barnes was in an upstairs bedroom. Although Marcotte testified that moments later he heard what he thought were rocks thrown against his house and a window breaking, two of his neighbors, Sears and Tyler, both heard gunshots at approximately 2 a.m. and shortly thereafter saw a man running from the scene. Tyler also saw something being tossed onto the passenger seat of the car parked in front of his house. Additionally, Leroux testified that he arrived on the scene in response to a telephone call by Marcotte that gunshots had been fired near his residence. Leroux explained to Marcotte that it was not rocks but bullets that had hit his house. Leroux and Marcotte observed bullet holes in the upstairs bedroom where Tammy Barnes previously had stayed with the defendant as well as another bullet hole in the kitchen. Marcotte testified that the bullet holes were not present the day before the incident. Further

police investigations revealed seven spent shell casings from the same firearm in the backyard of Marcotte's residence. We conclude that there was sufficient evidence for the jury to conclude that the defendant went to Marcotte's house looking for Tammy Barnes and fired several gunshots at Marcotte's house, specifically, the bedroom in which he believed Tammy Barnes was staying, in an attempt to injure her.

B

A conviction of burglary in the third degree in violation of § 53a-103[5] requires proof that the defendant entered or remained unlawfully in a building with intent to commit a crime therein. The defendant challenges the sufficiency of the evidence on the ground that the state failed to prove beyond a reasonable doubt that he intended to commit a crime when he entered the Mudges' apartment on August 2, 2003.

"Intent is a mental process, and absent an outright declaration of intent, must be proved through inferences drawn from the actions of an individual, i.e., by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Ward*, 76 Conn. App. 779, 798, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003). "The intent of the actor is a question for the trier of fact, and the conclusion of the trier in this regard should stand unless it is an unreasonable one." *State* v. *Avcollie*, 178 Conn. 450, 466, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983). Upon entering the Mudges' apartment without consent, the defendant took Tammy Barnes' cellular telephone and struck her. The defendant

---

[5] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

grabbed her arms so that she could not move and, in response to her statement to Patricia Mudge to telephone the police, stated that he would be able to hit Tammy Barnes before the police could arrive. Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have concluded that the evidence established that at the time of entering the dwelling, the defendant intended to commit the crime of assault against Tammy Barnes.

## II

The defendant next claims that the court violated his right to the effective assistance of counsel as guaranteed by the sixth amendment to the United States constitution by failing to inquire adequately into a claimed conflict of interest, which he did not waive, between him and his trial counsel when the court knew or should have known about the conflict. We disagree.

The following additional facts and procedural history are relevant to the defendant's claim. On the day jury selection was to begin, the court, *Foley, J.*, asked defense counsel if he was ready to proceed, and defense counsel responded, "no, with an explanation." Defense counsel stated: "Upon my arrival here this morning, Your Honor, my client informed me that he had filed a petition for habeas corpus, claiming, among other things, ineffective assistance of counsel with regard to the violation of probation hearing, which occurred in July. I'm not going to get into all the details of that at this point, Your Honor. He has also asked that the trial judge recuse himself. But this apparently was signed on the, looks like the twentieth of July, Your Honor, and I just found about this today. If I knew about it earlier, I would have informed the court prior. My client and I filed this—I'm not sure if I could proceed in the prosecution or the defense of his case, Your Honor. And if my client wishes to give up his right to a speedy

trial for the time being and attempt to get another attorney, that's certainly perhaps an option open to him. If he wishes to proceed, then obviously he'd have to proceed with me as counsel. And I feel a bit uncomfortable doing that if he feels that I have ineffectively represented him."

The court then asked the defendant if he wanted to proceed with jury selection, and the defendant responded, "no," but stated that he wanted to be heard on a motion for dismissal that he had also filed. The court then asked the defendant if he wanted defense counsel to represent him in arguing the motion for dismissal to which the defendant replied, "[y]es, sir." The defendant, in response to questions from the court regarding the motion, stated that his case should be dismissed because he had filed a speedy trial motion and that his trial had not begun within thirty days of the filing of that motion. The court explained that defense counsel had been on trial in another case and was on vacation during the time that the defendant's case would have proceeded and, thus, could not be present for the trial. The court denied the motion, noting that the state had been ready to proceed within thirty days of the speedy trial motion.

After the motion was argued and denied, the court asked the defendant if he wanted to proceed with jury selection. The defendant replied, "[y]eah, proceed," and then asked the court to recuse itself on the ground that the court had presided over his violation of probation hearing and pretrial hearings in the present case. The court informed the defendant that another judge could preside and again asked the defendant, "[a]re you ready to proceed? The defendant replied, "[y]eah. Ready to proceed." Defense counsel then stated that "my client has informed me he has filed this habeas corpus alleging ineffective assistance of counsel. So, if he wishes now to proceed, I certainly want to place on the record

that he in fact wishes me to represent him during this process, in spite of any other allegations he may have made against me, and wishes me to represent him in this case. If he wishes me to do that and the court wants me to, I will continue representation." In response to the court's questioning, the defendant indicated that he wanted defense counsel to continue to represent him, and defense counsel indicated that he was ready to proceed.[6] After a short recess, the court, *Dannehy, J.*, proceeded with jury selection.

The defendant seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] Although the defendant's claim meets *Golding*'s first two prongs, we conclude that his claim fails because he cannot satisfy the third prong by establishing that a constitutional violation clearly exists.

Before reviewing the defendant's claim, we underscore that our review is of the actions of the trial court, not of the actions of defense counsel. Our Supreme Court has instructed that "[a]lmost without exception, we have required that a claim of ineffective assistance

---

[6] The following colloquy occurred:

"The Court: Do you want [your attorney] to continue to represent you?

"[The Defendant]: Yeah, for speedy trial.

"[Defense Counsel]: You want me to represent you with regard to the speedy trial motion or with regard to picking the jury on this trial?

"[The Defendant:] With picking the jury on this trial, this case.

"[Defense Counsel]: Okay. Thank you.

"The Court: Okay. So, you're ready to proceed?

"[Defense Counsel]: I'm ready."

[7] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

of counsel . . . be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the trial court, rather than by those of his counsel." (Internal quotation marks omitted.) *State* v. *Drakeford*, 261 Conn. 420, 428, 802 A.2d 844 (2002).

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to [the] effective assistance of counsel. . . . Where a constitutional right to counsel exists . . . there is a correlative right to representation that is free from conflicts of interest. . . . There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists." (Citations omitted; internal quotation marks omitted.) *State* v. *Cator*, 256 Conn. 785, 793–94, 781 A.2d 285 (2001). "Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy." *State* v. *Crespo*, 246 Conn. 665, 697, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "In discharging this duty, the trial court must be able, and be freely permitted, to rely upon [defense] counsel's representation that the possibility of such a conflict does or does not exist. . . . The reliance in such an instance is upon the solemn representation of a fact made by [the] attorney as an officer of the court.

. . . The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Drakeford*, supra, 261 Conn. 427. "It is firmly established that a trial court is entitled to rely on the silence of the defendant and his attorney, even in the absence of inquiry, when evaluating whether a potential conflict of interest exists." (Internal quotation marks omitted.) *State* v. *Cator*, supra, 795.

Our Supreme Court has described a conflict of interest as "that which impedes [counsel's] paramount duty of loyalty to his client [such that] an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 689–90. "Conflicts of interest . . . may arise between the defendant and the defense counsel. The key here should be the presence of a specific concern that would divide counsel's loyalties. In some instances, defendants have sought (usually unsuccessfully) to convert general incompetence claims into conflict claims by arguing that the interest of counsel in protecting his reputation, in adhering to a particular philosophy, or in minimizing his effort constituted a conflicting interest that divided his loyalties. Typically, however, courts have looked to cases in which a representation fully devoted to [the] defendant's interest is likely to produce an adverse consequence unique to the individual case. Thus, the paradigm case is that in which the lawyer representing the defendant fears opening himself up to a criminal prosecution because he is under investigation for an offense relating to the same events." 3 W. LaFave, J. Israel & N. King, Criminal Procedure (2d Ed. 1999) § 11.9 (a), p. 653. Allegations that a defendant is simply

unhappy with counsel's performance, without more, do not create a conflict of interest. See *State* v. *Rodriguez*, 93 Conn. App. 739, 747, 890 A.2d 591 (inquiry made after timely conflict objection revealed insignificant, unsubstantiated complaints regarding counsel's performance that were not sufficient to warrant withdrawal of counsel), cert. granted on other grounds, 277 Conn. 930, 896 A.2d 102 (2006); see also *State* v. *Henton*, 50 Conn. App. 521, 527, 720 A.2d 517 (what defendant referred to as conflict of interest between him and trial counsel was mere disagreement because it did not arise out of counsel's representation of clients with adverse interests), cert. denied, 247 Conn. 945, 723 A.2d 322 (1998).

No timely conflict objection was made in this case. Therefore, when determining whether the court had a duty to inquire, we must determine whether the court knew or reasonably should have known that a conflict existed. The circumstances before the court did not amount to evidence of a specific conflict sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel was in jeopardy. See *State* v. *Crespo*, supra, 246 Conn. 697. In this case, defense counsel informed the court that the defendant had filed a habeas petition claiming that defense counsel had ineffectively represented him at a violation of probation hearing. The filing of a habeas petition does not create a per se conflict of interest. See *State* v. *Vega*, 259 Conn. 374, 388, 788 A.2d 1221 ("a grievance in and of itself is insufficient to establish a violation of a defendant's sixth amendment rights"), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). It may, however, create a potential conflict. See *Morgan* v. *Commissioner of Correction*, 87 Conn. App. 126, 131–32, 866 A.2d 649 (2005) (potential conflict of interest existed when petitioner brought to attention of habeas court that he had filed three grievances

against habeas counsel prior to habeas proceedings); see also *State* v. *Vega*, supra, 391 (trial court conducted appropriate inquiry as to alleged conflict of interest and potential violation of defendant's sixth amendment rights upon being informed by defendant that he had filed grievance against court-appointed counsel).

While the filing of a petition for habeas corpus conceivably can create a potential conflict of interest, it did not do so under the circumstances of this case. As previously stated, a conflict of interest impedes a counsel's duty of loyalty to his client, subjecting counsel to divided loyalties. *State* v. *Crespo*, supra, 246 Conn. 689–90; 3 W. LaFave, J. Israel & N. King, supra, § 11.9 (a), p. 653. Here, defense counsel merely stated that the habeas petition was filed; he did not indicate that any of his interests were diverse or otherwise discordant with the interests of the defendant, that his duty of loyalty to the defendant was divided or that he would be unable to represent the defendant effectively.

Additionally, defense counsel represented to the court that he was ready to proceed, and the defendant stated that he wanted defense counsel to represent him. Although defense counsel initially stated that he felt "a bit uncomfortable" representing the defendant due to his allegations that defense counsel had ineffectively represented him at a violation of probation hearing, defense counsel later agreed that he was ready to proceed. The court thereafter asked the defendant whether he wanted defense counsel to continue to represent him, and the defendant answered affirmatively and did not state any objection to being represented by defense counsel. "While *Holloway* v. *Arkansas*, [435 U.S. 475, 486, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978)] emphasized that it was not transferring to defense counsel the authority of the trial judge to rule on the existence or risk of a conflict, the trial court must be able, and be freely permitted, to rely upon counsel's representation

that the possibility of such a conflict does or does not exist. . . . The reliance in such an instance is upon the solemn representation of a fact made by [the] attorney as an officer of the court." (Citations omitted; internal quotation marks omitted.) *State* v. *Cruz*, 41 Conn. App. 809, 813–14, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996). "[D]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that [the potentially conflicted] representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. An attorney [facing a possible conflict] in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest *exists or will probably develop in the course of a trial.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 696, quoting *Cuyler* v. *Sullivan*, 446 U.S. 335, 346–47, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Defense counsel, who was in the best position professionally and ethically to determine when a conflict of interest exists or will develop in the course of trial; see *State* v. *Cator*, supra, 256 Conn. 795; told the court that he was ready to proceed.

The defendant argues alternatively that the court should have elicited from him a knowing and intelligent waiver of his constitutional right to conflict free representation before proceeding. "The scope of a court's inquiry, or the necessity for such inquiry, however, depends on the circumstances, and a court need not necessarily elicit a waiver." *State* v. *Cruz*, supra, 41 Conn. App. 814–15. Nothing defense counsel stated alerted the court to a potential conflict of interest;

rather, defense counsel agreed that he was ready to proceed. Therefore, the court was not alerted to a potential conflict of interest and, accordingly, did not have a duty to inquire. Thus, on the facts of this case, it was unnecessary for the court to obtain a waiver from the defendant. See id., 814–16.

The judgment is affirmed.

In this opinion the other judges concurred.