STATE OF CONNECTICUT *v.* LUIS
JIMENEZ-JARAMILL
(AC 33302)

Bear, Espinosa and Pellegrino, Js.

Argued January 11—officially released March 20, 2012

348

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Devant Joiner,* assistant state's attorney, for the appellant (state).

*Paul A. Garlinghouse,* for the appellee (defendant).

*Opinion*

PELLEGRINO, J. The state of Connecticut appeals from the judgment of the trial court dismissing the charge of creating a public disturbance in violation of General Statutes § 53a-181a brought against the defendant, Luis Jimenez-Jaramill.[1] On appeal, the state contends that the court erred when it (1) summarily dismissed the charge against the defendant sua sponte in the midst of the defendant's testimony on direct examination and (2) denied the state the opportunity to cross-examine the defendant or present rebuttal testimony prior to rendering the judgment of dismissal. We agree with the state and reverse the judgment of the trial court.

In light of the highly unusual procedural posture of this case, we set forth the following undisputed facts gleaned from the record before us. On the evening of May 14, 2010, Officer Martin Feliciano of the New Haven

---

[1] Pursuant to General Statutes § 54-96, the state requested, and the trial court granted, permission to appeal from the judgment of dismissal.

police department patrolled the Fair Haven district of New Haven. At approximately 6:26 p.m., Feliciano was outside his vehicle on James Street when he observed the defendant operating a Mazda Protégé while using a hand-held cell phone.[2] When Feliciano ordered the defendant to put the phone away, the defendant smiled at Feliciano and parked his vehicle on the right side of the road. A physical altercation thereafter ensued, at the conclusion of which the defendant was arrested and charged with various offenses. Those charges later were dismissed and replaced by an information charging the defendant with one count of creating a public disturbance in violation of § 53a-181a.

The defendant elected to plead not guilty to that infraction and a court trial commenced on January 25, 2011,[3] at which the state's case-in-chief consisted solely of the testimony of Feliciano. Feliciano testified that he first observed the defendant "operating [his vehicle] south on James Street, near Criscuolo Field, while holding a hand-held cell phone to his right ear, which was placed on his right hand. He also didn't have his safety seat belt on at the time."[4] Feliciano testified that when he instructed the defendant to put the cell phone away, the defendant "continued to drive towards me while talking on the cell phone as he smiled." Feliciano testified that he then pointed at the defendant and ordered him to pull the vehicle over. As he drove past Feliciano, the defendant "continued to speak on the cell phone. He put a grin on his face, a smirk." Feliciano testified that the defendant then parked the vehicle in a nearby parking spot on James Street. Feliciano detailed the

---

[2] General Statutes § 14-296aa prohibits the use of a hand-held cell phone by the operator of a motor vehicle while such vehicle is in motion.

[3] A defendant "has no right to a jury trial when he is charged with the infraction of creating a public disturbance." *State* v. *Lo Sacco*, 12 Conn. App. 481, 494, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987).

[4] General Statutes § 14-100a (c) (1) requires the operator of a motor vehicle to wear a seat safety belt while the vehicle is being operated on a highway.

physical altercation that followed in a colloquy with the state's attorney:

"Q. And what happens next?

"A. Immediately after I approached the vehicle, I'm like towards the end of the vehicle, the [defendant] immediately jumps out of the car. He clenches his fist and pushes me. He screamed—

"Q. Hold on. Officer, you say he jumps up and he clenches his fist?

"A. That's correct.

"Q. What type of a body stance did he take?

"A. That's a fighting stance.

"Q. A fighting stance?

"A. Yes, sir.

"Q. After the defendant takes the fighting stance, what happens?

"A. He pushes me.

"Q. And does he say anything?

"A. Yeah, he says, in Spanish, 'Por que me paras?' Why are you stopping me or pulling me over?

"Q. And what, if anything, do you do next?

"A. We . . . struggle . . . now I'm fighting for my safety.

"Q. So . . . there's a physical altercation that takes place?

"A. There is. . . .

"Q. Was an arrest done, Officer?

"A. Yes. After we managed to detain him, secure him, we arrested him for numerous infractions and violations. . . .

"Q. Officer, at any time during this struggle with the defendant did you feel threatened?

"A. Immediately after he got out of the vehicle, I felt threatened."

Following the testimony of Feliciano, the state rested while reserving the right to call Feliciano in rebuttal. Significantly, the defendant did not move for a judgment of acquittal at that time. Rather, he commenced his defense with the testimony of two witnesses to the events in question, Javier Darwin-Chuquilla and Segundo Sarango, neither of whom clearly observed the physical altercation between Feliciano and the defendant.[5] Due to the late time of day, the matter was continued until February 22, 2011.

At the outset of the February 22, 2011 proceeding, defense counsel informed the court that he had "two other witnesses besides my client." The court then stated: "All right. So . . . according to you we have three witnesses rather than two. So the court will make a determination how many witnesses we need. Obviously, after I have heard from the officer. I have heard from other witnesses. And at this time I would like to go ahead and, you know, have your client testify. . . . The intention of the court is this, I'm going to listen— I think it would be much more—I don't want to, you know, it's your case, the way you want [to] proceed. I have reviewed the testimony previously. It is in the best

---

[5] Darwin-Chuquilla testified that he could not see the defendant exit his vehicle at the time of the incident because a van obscured his view. Sarango likewise testified that he did not witness the defendant exiting his vehicle, stating that "I saw the car but I didn't see him. . . . I didn't have a clear view." Sarango nevertheless testified that "as soon as [the defendant] got out of the car, [Feliciano] jumped on him and he threw him on the ground."

interest, I think, if we hear from the defendant himself. It will be very helpful for the court to make a determination." With that, the trial resumed with the testimony of the defendant.

The defendant testified that, on the evening of May 14, 2010, he was driving to a soccer game at Criscuolo Park. He admitted that he was talking on a hand-held cell phone as he drove his vehicle to the park. The defendant testified that he saw a police officer on the street as he approached the park, whom he later identified as Feliciano. He testified that Feliciano yelled at him to put down the cell phone and that he immediately complied. The defendant explained that "because of my good nature, what I did was to smile and then park right in front of him." He further testified that his vehicle had a standard transmission, which required him to use both hands to park. The defendant testified that when he exited his vehicle and reached for a folder, Feliciano "jumped on my back. . . . He grabbed me . . . from the back. He grabbed me to the neck. He started slamming me against the car and to tell me that to get on the ground." At that point in the defendant's testimony, the court inquired as to how many questions defense counsel had for the witness, to which counsel responded, "of my client? . . . Probably a hundred more." The court then conducted a sidebar conference with another attorney about two unrelated matters.

When that sidebar conference concluded, the court stated, "All right. We are back on," at which point defense counsel conceded he could not recall his last question. The following colloquy ensued:

"The Court: That's fine. That's fine. . . . Okay. . . . Let me ask this from both. I have heard the testimony of the officer. I have heard other testimony from other witnesses. I think there were two witnesses. I have heard some of the testimony from the defendant in this

matter. It was a creating of public disturbance . . . right?

"[Assistant State's Attorney]: That's correct, Your Honor.

"The Court: It's an infraction. And it . . . was a $75 fine, right?

"[Assistant State's Attorney]: Right.

"The Court: And you indicated, [defense counsel], that [the defendant] has filed a civil lawsuit against—

"[Defense Counsel]: No. No, not yet.

"The Court: Not yet, okay. All right. Based on the testimony represented to the court and . . . after review of the file, the charges against the defendant, specifically the court was concerned about the testimony which was given by this officer that [the defendant] . . . clenched his fist and made . . . a gesture and pushed [the officer]. And the testimony which is presented today that he was driving a standard car which needs to park—at the parking at the time needs both hands, the clutch and the steering, the charges against your client are dismissed.

"[Defense Counsel]: Thank you, Your Honor.

"[Assistant State's Attorney]: Your Honor—

"The Court: Yes.

"[Assistant State's Attorney]: If the state can be heard? The state hasn't had an opportunity to cross-examine [the defendant] nor have we been able to call Officer Feliciano as a rebuttal witness for any of the testimony that's been given by the two witnesses nor [the defendant].

"The Court: I think it's in the best interest of the state and your time is much more precious than an infraction.

The . . . ruling which I have made based on what I have heard is my ruling. And I think that's the appropriate ruling. If you want to have an objection to that . . . you have absolutely every right. Your time is much more precious than a $75 infraction.

"[Assistant State's Attorney]: Thank you, Your Honor. The state objects to the entrance of the dismissal.

"The Court: All right. Thank you, sir. All right, Marshal, we are adjourned."

The judgment file in the present case likewise reflects that "[a] trial was held to the court beginning on January 25, 2011, and continuing on February 22, 2011. During the course of the trial, on February 22, 2011, the court concluded testimony and entered a judgment of dismissal on the charge of creating a public disturbance." From that judgment, the state now appeals.

I

The state's principal contention is that the court erred when it summarily dismissed the charge against the defendant midway through the defendant's testimony on direct examination. The state claims that there is no authority for a trial court in a criminal matter to sua sponte render a judgment of dismissal in such circumstances. The state further submits that the court's ruling both ran afoul of binding precedent of our Supreme Court and infringed on the constitutional mandate of separation of powers. We agree.

A

Our analysis, therefore, begins with the seminal decision of our Supreme Court in *State* v. *Kinchen*, 243 Conn. 690, 707 A.2d 1255 (1998).[6] The sole issue in *Kinchen* was "whether the trial court had the authority

---

[6] We note that the defendant in *Kinchen* was charged with the misdemeanor of criminal trespass in the first degree, which is a criminal offense.

to dismiss, sua sponte, a pending misdemeanor charge against the defendant . . . because, in the court's view, the case was not sufficiently important to warrant the time and expense of a jury trial." Id., 691–92. The court held that "in the absence of compliance with . . . General Statutes § 54-56, the trial court did not have such authority." Id., 692. In so doing, the court agreed with the state that, under the circumstances of that case, the dismissal of the charge against the defendant by the trial court "constituted an impermissible usurpation of the prosecutor's authority to charge the defendant in violation of the doctrine of separation of powers." Id., 698. As the court explained: "The separation of powers provision of article second of the Connecticut constitution provides in relevant part: The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. [T]he primary purpose of this constitutional doctrine is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. . . . [Thus, t]he separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power. . . . [I]n deciding whether one branch's actions violate the constitutional mandate of the separation of powers doctrine, the court will consider if the actions constitute: (1) an assumption of power that lies exclusively under the control of another branch; or (2) a significant interference with the orderly conduct of the essential functions of another branch." (Internal quotation marks omitted.) Id., 698–99.

The court continued: "The state's attorneys, who are responsible for prosecuting violations of the criminal

laws of this state, are executive branch officials. . . . There can be no doubt that [t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor. . . . Prosecutors, therefore, have a wide latitude and broad discretion in determining when, who, why and whether to prosecute for violations of the criminal law. . . . This broad discretion, which necessarily includes deciding which citizens should be prosecuted and for what charges they are to be held accountable . . . rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. . . . [J]udicial deference to the decisions of these executive officers . . . also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. . . .

"For these reasons, unless constitutional or other compelling reasons require otherwise, we abstain from setting policy for the performance of the prosecutorial function. . . . Consistently with this principle, the court, [i]n the absence of statutory authority . . . has no power of its own motion to dismiss a criminal prosecution unless there is a fundamental legal defect in the information or indictment (such as want of jurisdiction or form of the information), or a constitutional defect such as denial of the right to a speedy trial . . . ."[7] (Citations omitted; internal quotation marks omitted.) Id., 699–701. Because the trial court in *Kinchen* neither "identified [a] constitutional infirmity or other fundamental defect in the state's exercise of its prosecutorial authority to warrant dismissal of the . . . charge" nor purported "to be acting under any legislative grant of

---

[7] As the court noted in *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 575, 663 A.2d 317 (1995), "[t]he judicial branch . . . [is] not in the best position to consider the various factors that prosecutors weigh, such as the strength of the evidence, the visibility of the crime, the availability of resources and possible deterrent effects. Nor is the judicial branch anxious to consider the validity of various rationales advanced for particular charging decisions."

authority in dismissing the charge," our Supreme Court concluded that the trial court lacked "the power to terminate a prosecution" against the defendant. Id., 701.

That reasoning applies with equal force in the present case. Here, the trial court did not identify any constitutional infirmity or fundamental defect in the state's decision to charge the defendant with creating a public disturbance, nor did the court indicate that it was acting under any legislative grant of authority to dismiss that charge. Rather, the court repeatedly opined that the state's "time is much more precious than a $75 infraction." Reviewing the remarks of the court in their entirety, we can conclude only that the court sua sponte dismissed the charge against the defendant midway through the defendant's testimony on direct examination because, in its view, the case was not sufficiently important to warrant the time and expense of prosecution. In so doing, the court demonstrated little respect for the independence and broad discretion of the prosecutor and, by extension, a coordinate branch of government, flouting the fundamental principle that "it is the responsibility of the state's attorneys, not the judiciary, to determine when, who, why and whether to prosecute for violations of the criminal law." (Internal quotation marks omitted.) *State* v. *Kinchen*, supra, 243 Conn. 706.

B

As *Kinchen* instructs, a trial court in a criminal matter is empowered to render a judgment of dismissal only upon compliance with § 54-56. Id., 692. Pursuant to that statute, "[a]ll courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or

continuing of such information or the placing of the person accused therein on trial." General Statutes § 54-56. To fully evaluate the propriety of the trial court's sua sponte dismissal of a criminal prosecution, the court in *Kinchen*, assuming "arguendo, that the trial court [had acted] pursuant to the authority vested in it under § 54-56," considered the merits of such conduct. *State* v. *Kinchen*, supra, 243 Conn. 702. In an effort to divine any basis under Connecticut law for the court's ruling in the present case, we likewise assume arguendo that the court acted pursuant to § 54-56. For three distinct reasons, that statute is inapplicable to the case at hand.

First and foremost, the plain language of the statute provides for the dismissal of a case "upon motion by the defendant." It is undisputed that the defendant did not make such a motion in the proceeding below. In addition, the court generally has no authority under § 54-56 to dismiss a charge sua sponte. See *State* v. *Carr*, 172 Conn. 608, 610, 376 A.2d 74 (1977) ("the court has no power of its own motion to dismiss a criminal prosecution unless there is a fundamental legal defect in the information or indictment . . . or a constitutional defect"). In contravention of that principle, the court sua sponte rendered a judgment of dismissal in the midst of the defendant's direct examination testimony.

Second, the record demonstrates unequivocally that dismissal was not warranted under the evidential insufficiency prong of § 54-56. "In determining whether the evidence proffered by the state is adequate to avoid dismissal [under § 54-56], such proof must be viewed in the light most favorable to the state." *State* v. *Kinchen*, supra, 243 Conn. 702. To convict the defendant of creating a public disturbance in violation of § 53a-181a, the state must prove that the defendant "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof" either "(1) engages in fighting or in violent, tumultuous or threatening behavior; or (2)

annoys or interferes with another person by offensive conduct; or (3) makes unreasonable noise." Viewing Feliciano's testimony regarding the May 14, 2010 altercation with the defendant in the light most favorable to the state, that testimony amply established a violation of § 53a-181a. Consequently, a dismissal under the evidential insufficiency prong of § 54-56 is untenable.

Third, there is no basis on the facts of this case for dismissal under the insufficient cause prong of § 54-56. As our Supreme Court has explained, "a trial court is empowered to dismiss a case for insufficient cause under § 54-56 only in the most compelling of circumstances. . . . Because discretionary prosecutorial decisions, including the decision whether to proceed to trial, ordinarily are unreviewable by the court absent a showing of prosecutorial impropriety, the power to render a dismissal under § 54-56 for insufficient cause is to be sparingly exercised and then only with great caution and awareness of the probable consequences. . . . In order to ensure that this discretion is exercised in accordance with these principles, it is essential for the court *explicitly* to weigh all the competing factors and considerations of fundamental fairness to both sides—the defendant, the state and society, and presumably the victim. . . . This difficult and delicate process necessarily involves a careful consideration by the court of such factors as the strength of the state's case, the likelihood of conviction, the severity of the crime, its effect on the victim, the strength of the defendant's defense, the defendant's personal situation, and all the other myriad factors that underlie a judgment regarding fundamental fairness. . . . Thus, a trial court's invocation of its authority to dismiss a case under the insufficient cause prong of § 54-56 can be justified only when: (1) the court expressly and carefully has considered all of the relevant competing factors; and (2) dismissal is supported by overriding equitable considerations."

(Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Kinchen,* supra, 243 Conn. 703–704.

The record plainly reflects that the trial court here did not expressly consider the aforementioned factors. In such instances, our appellate courts refuse to "presume that the trial court considered factors to which absolutely no reference was made, either by the court or by the parties, prior to the court's dismissal of the charge." Id., 706. In addition, the record does not reveal compelling circumstances necessitating immediate dismissal. Id., 703. To paraphrase *Kinchen,* so long as the facts warranted a charge of creating a public disturbance, the prosecutor was entitled to pursue a conviction of that infraction. Id., 705. It does not matter at all that the punishment for conviction thereof was a $75 fine. It remains the exclusive prerogative "of the legislature, not the judiciary, to determine what conduct shall be deemed criminal . . . ." Id., 706. A dismissal of a prosecution predicated on one judge's view that the state's "time is much more precious than a $75 infraction" infringes on a core legislative function in violation of the separation of powers mandate of article second of our state constitution. Like our Supreme Court, we do not agree that § 54-56 "authorizes a trial court to dismiss a pending criminal case simply because it views the offense as not sufficiently serious to justify a prosecution." *State* v. *Kinchen,* supra, 243 Conn. 706. In the absence of express consideration of the relevant factors by the trial judge or any compelling equitable considerations, it is implausible to suggest that the court here was exercising its discretion under the insufficient cause prong of § 54-56.

C

Tellingly, the defendant at no point in this appeal has argued that the trial court was authorized to render a

judgment of dismissal in the present case. Instead, the defendant maintains that the court "made a technical error—a mistake in terminology" by dismissing the charge, when it intended to grant a motion for a judgment of acquittal sua sponte pursuant to Practice Book § 42-40. The state responds that the record does not substantiate that allegation. We agree with the state.

At the outset, we note that the court expressly indicated in both spoken and written word that it was rendering a judgment of dismissal. At the abrupt conclusion of the February 22, 2011 proceeding, the court stated that "the charges against [the defendant] are dismissed." The judgment file in this case similarly states that "[d]uring the course of trial . . . the court concluded testimony and entered a judgment of dismissal on the charge of creating a public disturbance." We nevertheless are mindful that a court's characterization of its own ruling is not dispositive of whether the ruling was, in fact, an acquittal. See *State* v. *Paolella*, 210 Conn. 110, 122, 554 A.2d 702 (1989). We thus look to the substance of the court's ruling to determine whether the court in substance rendered a judgment of acquittal, as the defendant maintains.

Practice Book § 42-40 provides in relevant part: "After the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority shall order the entry of a judgment of acquittal as to any principal offense charged and as to any lesser included offense for which the evidence would not reasonably permit a finding of guilty. . . ."[8] Likewise, Practice

---

[8] As one noted commentary observes, there exists a "concern that allowing trial judges to enter pre-verdict acquittals will open the door to judicial abuse and manipulation of the process, particularly since the prosecution will not be able to appeal." 6 W. LaFave et al., Criminal Procedure (3d Ed. 2007) § 24.6 (b), p. 442; see also R. Sauber & M. Waldman, "Unlimited Power: Rule 29 (a) and the Unreviewability of Directed Judgments of Acquittal," 44 Am. U. L. Rev. 433, 433–34 (1994) (advocating amendment of rule 29 of Federal Rules of Criminal Procedure to allow only postverdict judgments

Book §§ 42-41 and 42-42 articulate explicit procedures pertaining to motions for judgment of acquittal at "the close of the prosecution's case in chief" and "at the close of all the evidence" respectively. See also *State v. Higgins*, 74 Conn. App. 473, 479–80, 811 A.2d 765, cert. denied, 262 Conn. 950, 817 A.2d 110 (2003); cf. *State v. Perkins*, 271 Conn. 218, 240 n.26, 856 A.2d 917 (2004) ("our rules of practice do not permit the trial court to reserve its decision on a motion for a judgment of acquittal presented at the close of the state's case"). The defendant never moved for a judgment of acquittal in the trial court proceeding. More importantly, the record reflects that although the court acted sua sponte to terminate the prosecution of the defendant, it did not do so either at the close of the prosecution's case-in-chief or at the close of all the evidence. Rather, the court in this case terminated the prosecution in the midst of the defendant's testimony on direct examination. Rendering a judgment of acquittal in such a manner is impermissible under our law. The defendant has provided no authority, nor are we aware of any, for the proposition that a trial judge in such a proceeding may sua sponte interrupt the direct examination testimony of a witness testifying on behalf of a defendant to render a judgment of acquittal.[9] The court's failure to comply

of acquittal by court because double jeopardy prohibition mandates that "[n]o matter how irrational or capricious, the [trial] judge's ruling terminating the prosecution cannot be appealed").

[9] In his appellate brief, the defendant asserts that "a dismissal entered in the middle of a bench trial is 'in fact' a judgment of acquittal under federal procedural law." In support thereof, he provides a citation to *Smith v. Massachusetts*, 543 U.S. 462, 125 S. Ct. 1129, 160 L. Ed. 2d 914 (2005). *Smith* does not stand for the broad proposition advanced by the defendant and is distinguishable from the present matter in multiple respects. First, it involved a motion by the petitioner for "a required finding of not guilty" on a particular count on the basis that the state had not proven an element of the offense. Id., 465. Second, the petitioner made that motion "[a]t the conclusion of the prosecution's case." Id. Third, the court at that time granted the motion, although it "did not notify the jury of [the] petitioner's acquittal on [that] count." Id. *Smith* did not hold that *any* judgment terminating a prosecution rendered at *any* point during a court trial constitutes an acquittal.

with the well established prerequisites to granting an acquittal undermines the defendant's contention that the court merely made a mistake in terminology in rendering the judgment of dismissal.

Notwithstanding that fatal infirmity, the defendant focuses his attention on the court's confusing statement regarding the plausibility of making a clenched-fist gesture while simultaneously parking a car with a manual transmission. That statement merits closer examination. In terminating the defendant's prosecution, the court first asked the state's attorney whether the charge was an infraction and whether it involved a $75 fine, to which the state's attorney responded in the affirmative. The court then remarked that "[b]ased on the testimony represented to the court and . . . after review of the file, the charges against the defendant, specifically the court was concerned about the testimony which was given by this officer that [the defendant] . . . clenched his fist and made . . . a gesture and pushed [the officer] . . . . And the testimony which is presented today

In addition, the defendant at oral argument before this court asserted that the trial court retains an "inherent power to acquit" that "does not go away." According to the defendant, "the judge is not held hostage to the whims of the lawyers . . . as to how many witnesses we want to call"; rather, the court remains free to render a judgment of acquittal at any time in the proceedings that it is convinced that the evidence submitted by the state up to that point is insufficient. In his appellate brief, the defendant quotes the decision of our Supreme Court in *State* v. *Avcollie*, 178 Conn. 450, 455, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), for the proposition that "[t]he trial court's power to [grant a motion for judgment of acquittal] is inherent; the Practice Book merely lays out an advisable manner of exercising it." The defendant misrepresents that precedent. In *Avcollie*, the case was submitted to the jury on the charge of murder, which returned a guilty verdict. Id., 454. Prior to the acceptance of the verdict, the defendant moved to set aside the verdict, which the court granted. Id., 454–55. In affirming the propriety of that determination, our Supreme Court held that "[t]he trial court's power *to set aside a verdict* is inherent . . . ." (Emphasis added.) Id., 455. Neither *Avcollie* nor any other Connecticut appellate decision holds that the trial court possesses an inherent power to render a judgment of acquittal at any point in a criminal proceeding, as the defendant alleges.

that he was driving a standard car which needs to park—at the parking at the time needs both hands, the clutch and the steering, the charges against your client are dismissed."[10] When the state's attorney noted that he had not been given "an opportunity to [cross-examine] [the defendant or] to call Officer Feliciano as a rebuttal witness," the court replied: "I think it's in the best interest of the state and your time is much more precious than an infraction. The . . . ruling which I have made based on what I have heard is my ruling. And I think that's the appropriate ruling. If you want to have an objection to that . . . you have absolutely every right. Your time is much more precious than a $75 infraction."

The United States Supreme Court has explained that a "judgment of acquittal is a substantive determination that the prosecution has failed to carry its burden." *Smith* v. *Massachusetts*, 543 U.S. 462, 468, 125 S. Ct. 1129, 160 L. Ed. 2d 914 (2005). Our careful review of the court's remarks discloses nothing that either expressly or impliedly can be construed as the equivalent of a determination that the state failed to carry its burden, particularly when the court was obligated to wait until the close of all evidence, including cross-examination of the defendant by the state and presentation of rebuttal evidence by the state, before rendering such a judgment. Rather, we agree with the state that the transcript of the February 22, 2011 proceeding evinces an erroneous belief by the court that it had the discretion to dismiss, sua sponte, charges that it deemed

[10] On our review of the transcripts in the present case, we are perplexed by the court's apparent confusion regarding the evidence before it. Feliciano never testified that the defendant clenched his fists or made a threatening gesture while parking his vehicle; Feliciano testified that the defendant parked his vehicle, exited the vehicle *and then* assumed a "fighting stance." The court nevertheless stated that it was "concerned about [that] testimony" in light of the defendant's testimony that he was driving a vehicle with a manual transmission and thus needed both hands to park.

unworthy of prosecution. Cf. *State* v. *Daniels*, 209 Conn. 225, 236, 550 A.2d 885 (1988) (court's remarks indicated exercise of discretion under § 54-56 rather than acquittal), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). The record does not support the defendant's novel contention that, in rendering a judgment of dismissal of the charge against the defendant, the court intended to grant a motion for a judgment of acquittal.

In light of the foregoing, we conclude that the court improperly rendered a judgment of dismissal sua sponte midway through the defendant's direct examination testimony. As in *Kinchen*, the trial court's dismissal of the charge against the defendant constituted "an improper usurpation of an essential prosecutorial function"; *State* v. *Kinchen*, supra, 243 Conn. 708; as it is exclusively "the responsibility of the state's attorneys, not the judiciary, to determine when, who, why and whether to prosecute for violations of the criminal law." (Internal quotation marks omitted.) Id., 706.

II

The state also claims that the court improperly denied it the opportunity to cross-examine the defendant and present rebuttal testimony prior to rendering the judgment of dismissal.[11] In light of our conclusion that the court improperly rendered a judgment of dismissal, we need not discuss this claim in much detail. That is not to say that the claim is without merit. To the contrary, we deem it to be most troubling.

In the present case, Feliciano testified on behalf of the state that the defendant jumped out of his vehicle, clenched his fists in a fighting stance and then pushed

---

[11] Although the state also argues that the court improperly denied it the opportunity to present closing argument, we do not consider that aspect of its claim in light of the court's authority to sua sponte render a judgment of acquittal at the close of all evidence. See Practice Book § 42-40.

the officer. In concluding its case-in-chief, the state reserved the right to recall Feliciano as a rebuttal witness. In his direct examination testimony, the defendant disputed Feliciano's testimony, stating in relevant part that when he exited his vehicle, Feliciano "jumped on my back. . . . He grabbed me . . . from the back. He grabbed me to the neck. He started slamming me against the car and to tell me that to get on the ground." Moments later, the court interrupted that testimony and rendered the judgment of dismissal, despite the state's immediate objection that it "hasn't had an opportunity to [cross-examine] [the defendant] nor have we been able to call Officer Feliciano as a rebuttal witness." Noting that objection, the court nevertheless adjourned the proceeding at that time.

As the United States Supreme Court has observed, "[i]t is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States* v. *Havens*, 446 U.S. 620, 626–27, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980). In *State* v. *Alexander*, 254 Conn. 290, 297–98, 755 A.2d 868 (2000), our Supreme Court similarly explained that "by exercising his fifth amendment right to testify on his own behalf, it is axiomatic that a defendant opens the door to comment on his veracity. It is well established that once an accused takes the stand and testifies his credibility is subject to scrutiny and close examination. . . . A defendant cannot both take the stand and be immune from impeachment. . . . An accused who testifies subjects himself to the same rules and tests which could by law be applied to other witnesses. . . . [W]hen a defendant assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." (Citations omitted; internal

quotation marks omitted.) In rendering a judgment of dismissal sua sponte in the midst of the defendant's direct examination testimony, the court violated that bedrock principle. The state, like any party to such a proceeding, was entitled to subject the defendant's testimony to "testing in the crucible of cross-examination," which ensures the reliability of evidence. *Crawford* v. *Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Similarly, "when the state rests its case-in-chief marks an important juncture in a criminal trial. It is to bring to an end voluntarily the introduction of evidence, the right to introduce fresh evidence, *except in rebuttal*, being thereupon lost." (Emphasis added; internal quotation marks omitted.) *State* v. *Allen*, 205 Conn. 370, 379, 533 A.2d 559 (1987). "[T]estimony of rebuttal witnesses is directed toward impeaching the prior testimony of opposing witnesses . . . ." *State* v. *Robinson*, 230 Conn. 591, 601 n.13, 646 A.2d 118 (1994); see also *State* v. *Watkins*, 14 Conn. App. 67, 76, 540 A.2d 76 (when presenting rebuttal evidence, state confined to testimony directed at refuting evidence given by defendant or in general contradiction of testimony given by defendant), cert. denied, 208 Conn. 804, 545 A.2d 1102 (1988). Our Supreme Court has held that the state possesses "a right on rebuttal to have the officer relate what he claims occurred, not for the truth of the statements made, but for the fact that they were not made as related by the defendant." *State* v. *Grayton*, 163 Conn. 104, 110, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972). We agree with the state that, in rendering a judgment of dismissal during the defendant's direct examination testimony, the court infringed on that right.

### III

Although he failed to file a statement of an alternate ground of affirmance with this court, the defendant in

his appellate brief asserts that "[a]ny further proceedings against [him] deprive him of dual constitutional liberties to be free from double jeopardy." He thus posits that, irrespective of the propriety of the judgment of the trial court terminating his prosecution, a retrial would violate the double jeopardy clause. We agree that this issue merits attention, but disagree that the facts of this case implicate that constitutional guarantee.

The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." That constitutional mandate is applicable to the states through the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *State* v. *McCall*, 187 Conn. 73, 89, 444 A.2d 896 (1982). "The constitution of Connecticut does not contain an express prohibition against double jeopardy. Instead, we repeatedly have held that the due process guarantees, presently encompassed in article first, § 8, of the Connecticut constitution, include protection against double jeopardy. . . . Connecticut historically maintained one of the least protective double jeopardy doctrines in the nation. . . . It therefore follows that [t]he Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy." (Citations omitted; internal quotation marks omitted.) *State* v. *Thomas*, 296 Conn. 375, 383 n.7, 995 A.2d 65 (2010). In addition, the defendant has not distinctly provided an independent state constitutional analysis. We thus confine our consideration to the application of the federal constitution's double jeopardy bar. See *State* v. *Colton*, 234 Conn. 683, 686 n.6, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

A

The protections afforded by the double jeopardy clause attach "only to proceedings which are essentially

criminal." (Internal quotation marks omitted.) *State* v. *McDowell*, 242 Conn. 648, 653, 699 A.2d 987 (1997), quoting in part *Breed* v. *Jones*, 421 U.S. 519, 528, 95 S. Ct. 1779, 44 L. Ed. 2d 346 (1975). "[T]he [d]ouble [j]eopardy [c]lause does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment. . . . [It] protects only against the imposition of multiple *criminal* punishments for the same offense . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Hudson* v. *United States*, 522 U.S. 93, 98–99, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997). Accordingly, as a threshold matter, we consider whether § 53a-181a is essentially criminal.[12] The question of whether a trial on acts classified as infractions under Connecticut law implicates the double jeopardy clause is one of first impression in this state.[13] Our review over that question of law is plenary. See *State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009).

The precedent of the United States Supreme Court instructs that "[w]hether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. . . . A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or another." (Citation omitted; internal quotation marks omitted.) *Hudson* v. *United States*, supra, 522 U.S. 99. Guided by the familiar refrain of General Statutes § 1-2z, we note that § 53a-181a (b) plainly and unambiguously provides that "[c]reating a public disturbance is an infraction." General Statutes § 53a-24 (a) defines the term offense as it is used in

---

[12] We note that the state in the present case has not argued that infractions under our law do not give rise to double jeopardy concerns.

[13] In a related context, our Supreme Court has held that "an administrative license suspension under [General Statutes] § 14-227b does not constitute a [criminal] conviction for purposes of the federal double jeopardy protections." *State* v. *Burnell*, 290 Conn. 634, 651, 966 A.2d 168 (2009).

our penal code. It provides in relevant part that "[t]he term 'offense' means any crime or violation which constitutes a breach of any law of this state or any other state, federal law or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed, except one that defines a motor vehicle violation *or is deemed to be an infraction*. The term 'crime' comprises felonies and misdemeanors. . . ." (Emphasis added.) General Statutes § 53a-24 (a). Thus, the plain and unambiguous language of § 53a-24 (a) indicates that infractions, such as creating a public disturbance, are not classified as criminal offenses under Connecticut law.

At the same time, it is well established that "[w]hat may or may not be a criminal offense for purposes of a particular statutory categorization is not necessarily determinative of whether it is a criminal offense for [other] purposes . . . ." (Internal quotation marks omitted.) *State* v. *Guckian*, 226 Conn. 191, 198, 627 A.2d 407 (1993). The legislature's "designation of a penalty as [noncriminal] is entitled to considerable deference. However, in determining whether a sanction constitutes punishment for double jeopardy purposes, labels such as 'criminal' and 'civil,' 'fine' and 'repayment' are not controlling." 22 C.J.S. 351, Criminal Law § 270 (2006).

As the United States Supreme Court has explained, "[e]ven in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect . . . as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty . . . ." (Citations omitted; internal quotation marks omitted.) *Hudson* v. *United States*, supra, 522 U.S. 99. That inquiry entails application of what the United States Supreme Court described as useful guideposts: "(1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has

historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned." (Internal quotation marks omitted.) Id., 99–100. The court instructed that "these factors must be considered in relation to the statute on its face . . . and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty . . . ." (Citations omitted; internal quotation marks omitted.) Id., 100.

Thus, the classification by our General Assembly of infractions as noncriminal acts payable by fine is entitled to significant deference. That classification operates as a presumption that infractions under Connecticut law do not constitute criminal offenses for purposes of double jeopardy analysis, albeit one that is rebuttable by clear proof to the contrary.

Such clear proof is lacking in the present case. It is undisputed that the defendant, if convicted, faced a $75 fine for violating § 53a-181a.[14] That penalty plainly does not involve an affirmative disability or restraint. Rather, it is merely a monetary sanction, which has "[not] historically been viewed as punishment." Id., 104. Moreover, the behavior to which § 53a-181a applies already is a crime. See General Statutes § 53a-182.[15] We further

---

[14] Pursuant to General Statutes § 51-164m (a), "[t]he judges of the Superior Court shall establish and maintain a schedule of fines to be paid for the violation of the sections of the general statutes deemed to be infractions. . . ." The fine imposed in the present case was $75.

[15] "The predicate clause and the first three subdivisions of § 53a-182 (a) are mirrored by . . . § 53a-181a, creating a public disturbance. . . . The language of the statutes is nearly identical. For constitutional purposes, however, there is a crucial difference between these two enactments. A

note that a "defendant has no right to a jury trial when he is charged with the infraction of creating a public disturbance"; *State* v. *Lo Sacco*, 12 Conn. App. 481, 494, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987); even when charged by information. *State* v. *Weisser*, 9 Conn. App. 255, 256–57, 518 A.2d 655 (1986), cert. denied, 202 Conn. 803, 519 A.2d 1207 (1987). The fact that the sixth amendment right to a jury trial is not implicated in trials on the infraction of creating a public disturbance strongly suggests, if not compels the conclusion, that such trials are not essentially criminal in nature.[16]

Admittedly, § 53a-181a has a scienter component, though it is not an essential element of the infraction.[17] In addition, General Statutes § 51-164n (g) provides in relevant part that "[i]n any trial for the alleged commission of an infraction, the practice, procedure, rules of evidence and burden of proof applicable *in criminal proceedings* shall apply. Any person found guilty at the trial or upon a plea shall be guilty of the commission of an infraction and shall be fined . . . ." (Emphasis added.) That procedural provision arguably cuts both

conviction under § 53a-182, a misdemeanor offense, creates a criminal record; whereas a conviction under § 53a-181a, a mere infraction, does not result in a criminal record. General Statutes § 53a-181a (b). As a result of this distinction, a conviction under § 53a-182 can result in the loss of liberty with a maximum sentence of three months, and a maximum fine of $500; the most severe sentence authorized under § 53a-181a is a fine of $100." *State* v. *Indrisano*, 228 Conn. 795, 829–31, 804, 640 A.2d 986 (1994) (*Berdon, J.*, dissenting).

[16] We likewise note that the United States Supreme Court, as a general matter, has held that "an indigent litigant has a [sixth amendment] right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 26–27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). That constitutional guarantee does not apply in the present case, as the charge of creating a public disturbance did not expose the defendant to a possible deprivation of physical liberty.

[17] Section 53a-181a requires proof that a person either intends "to cause inconvenience, annoyance or alarm" or "recklessly [creates] a risk thereof" by engaging in certain enumerated acts.

ways. On one hand, it expressly indicates that a defendant charged with a violation of § 53a-181a is subject to a trial akin to a criminal proceeding. On the other hand, by importing those protocols to such a trial the legislature suggests that the proceeding, at its essence, is not criminal in nature. Indeed, the statute plainly indicates that one found guilty after such a proceeding "shall be guilty of the commission of an infraction and shall be fined . . . ." General Statutes § 51-164n (g).

Lastly, the imposition of a nominal monetary fine for violating § 53a-181a appears to promote the traditional aims of punishment, retribution and deterrence, and we perceive no alternative purpose to that assessment. At the same time, "all civil penalties have some deterrent effect"; *Hudson* v. *United States*, supra, 522 U.S. 102; and monetary sanctions "have been upheld against the contention that they are essentially criminal . . . ." *Helvering* v. *Mitchell*, 303 U.S. 391, 400, 58 S. Ct. 630, 82 L. Ed. 917 (1938). The critical question remains "whether the statutory scheme was so punitive either in purpose or effect . . . as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty . . . ." (Citations omitted; internal quotation marks omitted.) *Hudson* v. *United States*, supra, 99. We answer that query in the negative. Application of the factors relevant to our analysis persuades us in convincing fashion that no clear proof exists to override the General Assembly's classification of the charge of creating a public disturbance as an infraction, rather than a criminal offense. Because a trial on that charge is not essentially a criminal proceeding; *State* v. *McDowell*, supra, 242 Conn. 653; further proceedings in the present case do not run afoul of the double jeopardy clause.

B

Even if we were to conclude—in light of the mandate of § 51-164n (g) that in trials for infractions "the practice, procedure, rules of evidence and burden of proof

applicable in criminal proceedings shall apply" and the fact that the imposition of a nominal monetary fine for violating § 53a-181a promotes the traditional aims of punishment—that a trial on that charge was essentially criminal, the defendant still could not prevail on the merits of his double jeopardy challenge. Cf. *State* v. *Price*, 208 Conn. 387, 391–92, 544 A.2d 184 (1988). The basis of his challenge is twofold. The defendant argues (1) that a retrial after a judgment of acquittal violates that constitutional prohibition and (2) that because "jeopardy attached at the bench trial . . . the state cannot now request a remedy that would expose the defendant to criminal liability." Those claims equally are without merit.

It is well established that retrial after the rendering of a judgment of acquittal constitutes double jeopardy. *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977); see also *State* v. *Ledbetter*, 240 Conn. 317, 323, 692 A.2d 713 (1997). Nevertheless, as previously discussed in part II of this opinion, the present case does not involve a judgment of acquittal, but rather a judgment of dismissal.

It is equally well established that jeopardy attaches, in a nonjury trial, as soon as the court begins to hear evidence. *Serfass* v. *United States*, 420 U.S. 377, 388, 95 S. Ct. 1055, 43 L. Ed. 2d 265 (1975); *State* v. *Kasprzyk*, 255 Conn. 186, 192, 763 A.2d 655 (2001). The defendant insists that because the court in this nonjury trial heard evidence prior to terminating his prosecution, retrial necessarily would constitute a double jeopardy violation. Though superficially attractive, that argument fails because it rests on a flawed understanding of established double jeopardy jurisprudence.

For example, in *United States* v. *Scott*, 437 U.S. 82, 98 S. Ct. 2187, 57 L. Ed. 2d 65 (1978), the defendant

sought and obtained a midtrial dismissal of his prosecution and the government thereafter attempted to appeal therefrom. In determining that such an appeal was permissible, the court reasoned that "a defendant is acquitted only when the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged. . . . Where the court, before the [finder of fact] returns a verdict, enters a judgment of acquittal . . . appeal will be barred *only when it is plain that the [trial court] evaluated the [g]overnment's evidence and determined that it was legally insufficient to sustain a conviction.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 97. The court thus held that "in a case such as this the defendant, by deliberately choosing to seek termination of the proceedings against him on a basis unrelated to factual guilt or innocence of the offense of which he is accused, suffers no injury cognizable under the [d]ouble [j]eopardy [c]lause if the [g]overnment is permitted to appeal from such a ruling of the trial court in favor of the defendant." Id., 98–99. "No interest protected by the [d]ouble [j]eopardy [c]lause is invaded when the [g]overnment is allowed to appeal and seek reversal of such a midtrial termination of the proceedings in a manner favorable to the defendant." Id., 100.

Our Supreme Court has confronted comparable double jeopardy challenges. In *State* v. *Kruelski*, 250 Conn. 1, 2–3, 737 A.2d 377 (1999), cert. denied, 528 U.S. 1168, 120 S. Ct. 1190, 145 L. Ed. 2d 1095 (2000), the sole issue was "whether the state is barred by the double jeopardy clause . . . from retrying a defendant who is charged with a crime and, after a jury is empaneled and sworn, acquitted on a statute of limitations defense."[18] The

[18] In jury trials, jeopardy attaches when a jury is empaneled and sworn. *State* v. *Price*, supra, 208 Conn. 391.

defendant argued further prosecution was barred because the court had granted his motion for a judgment of acquittal. The state did not dispute the general proposition that retrial following the rendering of a judgment of acquittal runs afoul of the double jeopardy prohibition. Instead, it argued that "the trial court's judgment does not constitute an acquittal for purposes of double jeopardy because it was based solely on the defendant's statute of limitations defense, and not on a determination that the state's evidence regarding any element of [the charged offense] was insufficient to support a guilty verdict." Id., 5.

Relying on *United States* v. *Scott*, supra, 437 U.S. 82, the court observed that "regardless of a trial court's characterization of its disposition of a case, the double jeopardy clause of the federal constitution does not bar a state from bringing a further criminal proceeding against a defendant who sought and obtained a favorable midtrial termination of criminal proceedings on legal grounds unrelated to a determination as to the sufficiency of the evidence regarding the defendant's factual innocence or guilt of the offense charged." *State* v. *Kruelski*, supra, 250 Conn. 7. The critical inquiry, the court explained, is "whether the trial court's judgment was based on legal grounds unrelated to a determination of the sufficiency of the evidence regarding the defendant's factual innocence or guilt." Id., 8. Because the trial court's judgment of acquittal "was based solely on the defendant's statute of limitations defense and not on any resolution in favor of the defendant of any element of [the charged offense]," the court concluded that "the judgment rendered by the trial court does not constitute an acquittal for purposes of double jeopardy, and, consequently, the legal restraints of the law pertaining to the defendant's double jeopardy rights do not bar a retrial in this case." Id., 12; see also *United States* v. *Martin Linen Supply Co.*, supra, 430 U.S. 572 (holding

that double jeopardy is barred by acquittal only when it is "plain" that court evaluated state's evidence and determined that it was legally insufficient to sustain conviction).

Perhaps most similar to the present case is *State* v. *Bruno*, 293 Conn. 127, 975 A.2d 1253 (2009), which involved a trial to the court on part B of a two part information, which charged the defendant with being a persistent drug offender in violation of General Statutes § 21a-278. Following the part B proceeding, "the trial court indicated that it had concluded that the 'persistent offender statute of title 53a of the General Statutes' did not apply to convictions under § 21a-278. The trial court reached this conclusion on its own initiative, without the filing of any motions or briefs, or any other input, by the parties. Accordingly, the trial court stated that the defendant was 'not guilty' of the charge in part B of the information." Id., 134–35.

From that judgment, the state appealed, at which time the defendant asserted that retrial on part B of the information would violate the double jeopardy prohibition. Id., 139. In rejecting that claim, our Supreme Court noted that "double jeopardy principles do not bar an appeal by the state from a judgment that was based on legal grounds unrelated to a determination of the sufficiency of the evidence regarding the defendant's factual innocence or guilt." Id., 140. "Rather, a defendant is acquitted only when the ruling of the judge, whatever its label, actually represents a resolution . . . of some or all of the factual elements of the offense charged. . . . [When] the court, before the jury returns a verdict, enters a judgment of acquittal . . . [retrial] will be barred only when it is plain that the [trial court] . . . evaluated the [g]overnment's evidence and determined that it was legally insufficient to sustain a conviction. . . .

"We conclude that t ese principles also apply in the present case. The trial court's ruling on part B of the information was based not on an evaluation of the state's evidence and a determination that it was insufficient to support a finding that the defendant previously had violated § 21a-278 (b) but on the court's legal determination that the defendant simply cannot be convicted of the offense charged . . . . Thus, despite the trial court's statement that the defendant was not guilty, the court's ruling was the functional equivalent of a midtrial dismissal of part B of the information and did not constitute a determination that, on the facts adduced at trial, the state had failed to prove its case. In other words, despite the language that the trial court used in announcing its decision, that decision represented a legal ruling tantamount to a dismissal rather than a verdict of not guilty. . . . We conclude, therefore, that retrial of the defendant on part B of the information is not barred by the double jeopardy clause." (Citations omitted; internal quotation marks omitted.) Id., 141–42.

That precedent is dispositive of the defendant's double jeopardy challenge. Like *Bruno*, the present case involves a determination by the court in a bench trial dismissing the prosecution of the defendant on a basis reached on its own initiative, without the filing of any motions or briefs, or any other input, by the parties. Like *Bruno*, that basis did not involve a judicial determination that the state's evidence was legally insufficient to sustain a conviction. Accordingly, we conclude, as did our Supreme Court in *Bruno*, that a retrial of the defendant is not barred by the double jeopardy clause.

Our conclusion today comports with the purposes underlying the prohibition against double jeopardy. Just as the "the [s]tate with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense"; *Green* v. *United States*, 355 U.S. 184, 187, 78 S. Ct. 221, 2 L. Ed.

2d 199 (1957); society possesses an "interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Arizona* v. *Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). As was the case in *United States* v. *Scott*, supra, 437 U.S. 96, the state here indicated its willingness to continue with the production of evidence, as well as the crucible of cross-examination, to establish the defendant's guilt. When the court abruptly terminated the defendant's direct examination testimony and rendered a judgment of dismissal, it deprived the prosecution and the people of Connecticut their one complete opportunity to convict the defendant.[19] Because the trial court plainly did not evaluate the state's evidence and determine that it was legally insufficient to sustain a conviction; *United States* v. *Martin Linen Supply Co.*, supra, 430 U.S. 572; the protections afforded by the double jeopardy clause are not implicated in this case.

IV

As a final matter, we address the defendant's allegation that this court should not review the merits of the state's claims due to inadequate briefing. Specifically, he alleges that because the state's brief did not contain an explicit conclusion stating the precise relief sought in contravention of Practice Book § 67-4 (e), we are left to "speculate as to the substance of the remedy the state seeks."

At the outset, we acknowledge that the conclusion of the state's principal brief merely provides that "[f]or the foregoing reasons, the trial court's judgment should

---

[19] We note that the midtrial termination of a prosecution by the trial court almost always will inure to the benefit of the defendant, as the state cannot move for, nor is the court authorized to grant, a directed verdict in its favor. See *Sullivan* v. *Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) ("although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the [s]tate, no matter how overwhelming the evidence").

be reversed." Nevertheless, it remains that the defendant at no time in this appeal moved to strike the state's brief pursuant to Practice Book § 66-2 so as to both alert the state to the perceived infirmity and afford it the opportunity to correct said shortcoming.

In addition, we note that the defendant's own brief in multiple respects does not comply with our rules of appellate procedure. As we already have noted, his brief raises an alternate ground for affirmance despite the fact that he never filed notice of such ground pursuant to Practice Book § 63-4 (a) (1). The statement of facts contained therein lacks any "appropriate references to the page or pages of the transcript or to the relevant document upon which the appellee relies" in violation of Practice Book § 67-5 (c). Even more egregious is the fact that the defendant appended to his brief numerous affidavits that were not before the trial court in the present case and, hence, not part of the record for appeal. Indeed, upon motion by the state, this court on October 26, 2011, ordered "that the written statements/ affidavits included [in] the defendant-appellee's appendix, as well as references to these documents on page one of the defendant-appellee's brief, are stricken." In the face of such noncompliance with the appellate rules of procedure, we are not inclined to countenance a hypertechnical critique of the concluding statement of the state's brief. To do so would exalt form over substance when implicit in the state's brief, and explicit in its reply brief, is a request that this court remand the matter for retrial.

Moreover, we remind counsel that this court possesses "an inherent supervisory authority over the administration of justice. . . . [T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections

are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000); see also Practice Book §§ 60-1 and 60-2. Ordinarily, our supervisory powers are invoked "to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." *State* v. *Ledbetter*, 275 Conn. 534, 578, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). As our Supreme Court explained, "[s]upervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002). At the same time, "[a]lthough [w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures . . . we also have exercised our authority to address the result in individual cases . . . because [certain] conduct, although not rising to the level of constitutional magnitude, is unduly offensive to the maintenance of a sound judicial process." (Citation omitted; internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001).

In the present case, the state immediately objected to the judgment of dismissal and cogently articulated the claims it now advances on appeal. Even had it not, the facts of this case would warrant the exercise of our supervisory powers to rectify the egregious impropriety that transpired in the proceeding below. Left unchecked, the implications of the trial court's sua sponte dismissal of the state's case midway through the defendant's testimony on direct examination are alarming. Considered in tandem with the defendant's

own failures to comply with the rules of appellate procedure, we refuse to deny review of the state's well founded claims in this appeal.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.